898 F.2d 1577
 11 ITRD 2521
 MITSUBISHI ELECTRIC CORPORATION; NEC Corporation and NEC
America, Inc.; OKI Electric Industry Co., Ltd.; Matsushita
Communication Industrial Co., Ltd.; Matsushita
Communication Corporation of America; and Panasonic
Industrial Co., a Division of Matsushita Electric
Corporation of America, Plaintiffs-Appellants,
v.
The UNITED STATES, and Motorola, Inc., Defendants-Appellees.
 Nos. 89-1514, 89-1515, 89-1525 and 89-1540.
 United States Court of Appeals,
Federal Circuit.
 March 15, 1990.
 
 A. Paul Victor, Weil, Gotshal & Manges, New York City, argued for plaintiffs-appellants. With him on the brief were Thomas P. Ondeck, Baker & McKenzie, Robert E. Montgomery, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, and Robert C. Cassidy, Jr., Wilmer, Cutler & Pickering, of Washington, D.C.
 A. David Lafer, Dept. of Justice, Washington, D.C., argued for defendants-appellees. Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrensis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., were on the brief for defendants-appellees. Also on the brief were Wendell L. Willkie, II, Gen. Counsel, Stephen J. Powell, Chief Counsel for Import Admin. and Stephanie Mitchell, Atty.-Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, Washington, D.C., of counsel. Harvey M. Applebaum, Covington & Burling, Washington, D.C., argued for defendants-appellees. With him on the brief were David R. Grace and Sonya D. Winner. Also on the brief was David F. Hixson, Motorola, Inc., Schaumburg, Ill., of counsel.
 Before MARKEY, Chief Judge, FRIEDMAN, Senior Circuit Judge, and MILLS,* District Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 This is an appeal from a decision and judgment of the United States Court of International Trade that upheld an antidumping order issued by the International Trade Administration of the Department of Commerce (Administration) covering cellular mobile telephones (CMTs) and subassemblies imported from Japan. Mitsubishi Elec. Corp. v. United States, 700 F.Supp. 538 (Ct. Int'l Trade 1988). The appellants challenge the scope of the antidumping order. We affirm.
 
 
 2
 * The statutory scheme governing the investigation of dumping complaints and the issuance of antidumping orders comprises three steps involving two separate agencies. (1) The Administration determines whether "a class or kind of foreign merchandise is being, or likely to be" dumped in the United States, i.e., "sold in the United States at less than its fair value," 19 U.S.C. Sec. 1673(1) (1982); (2) the International Trade Commission (Commission) determines whether "an industry in the United States" is "materially injured" or "threatened with material injury," or "the establishment of an industry in the United States is materially retarded" "by reason of" imports of that merchandise or sales of that merchandise for importation, 19 U.S.C. Sec. 1673(2) (1982 & Supp. II 1984); (3) if both of these determinations are adverse to the imported merchandise, the Administration issues an antidumping order imposing upon the merchandise "an antidumping duty ... in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise," 19 U.S.C. Sec. 1673 (Supp. II 1984).
 
 
 3
 In November 1984, the appellee Motorola, Inc. (Motorola) filed an antidumping petition with the Department of Commerce and the Commission alleging that specified Japanese manufacturers were selling cellular mobile telephones in the United States at less than fair value, and that those sales materially injured, threatened materially to injure, and materially retarded the establishment of "the domestic industry producing cellular mobile telephones, including mobile transceivers and subassemblies." Motorola stated that:
 
 
 4
 The class or kind of merchandise covered by this petition is all cellular mobile telephones manufactured in Japan, plus all mobile transceivers or kits of components and subassemblies manufactured in Japan for use in final assembly of cellular mobile telephones.
 
 The petition explained that the
 
 5
 inclusion of mobile transceivers and kits in an antidumping order is essential to prevent the Japanese manufacturers from avoiding the impact of any final relief issued in this proceeding by simply importing mobile transceivers or kits containing most of the necessary subassemblies or components into the United States for final assembly and testing.
 
 
 6
 The petition stated that "several Japanese manufacturers have made preliminary plans to circumvent the law by creating the facade of manufacturing cellular mobile telephones in the United States; when in fact that 'manufacturing' uses kits (collections of key components) or mobile transceivers (containing roughly 80% of the cellular mobile telephone's electronics) that are made in Japan."
 
 
 7
 Both the Administration and the Commission initiated preliminary investigations into the importation of CMTs and subassemblies. Commission, Cellular Mobile Telephones and Subassemblies Thereof From Japan, No. 731-TA-207, 49 Fed.Reg. 45,274 (Nov. 15, 1984); Administration, Cellular Mobile Telephones and Subassemblies from Japan, No. A-588-405, 49 Fed.Reg. 47,076 (Nov. 30, 1984).
 
 
 8
 Following its preliminary investigation, the Administration in June 1985 published a preliminary determination "that cellular mobile telephones and subassemblies from Japan [were] being, or likely to be, sold in the United States at less than fair value...." Administration, Cellular Mobile Telephones and Subassemblies From Japan; Preliminary Determination of Sales at Less Than Fair Value, No. A-588-405, 50 Fed.Reg. 24,554, 24,554 (June 11, 1985). The Administration defined
 
 
 9
 "subassembly" as
 
 
 10
 any completed or partially completed circuit boards, circuit modules and/or any packaged assemblage of electronic components, the value of which is equal to or greater than five dollars, and which are dedicated for use in CMT transceivers or control units.
 
 
 11
 Id. at 24,554.
 
 
 12
 The Administration explained that "[t]he determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on CMTs through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies." Id. at 24,555. The Administration rejected the argument of the respondents before it (the Japanese manufacturers accused of dumping) that the agency had no authority to include separately imported discrete subassemblies, because it concluded that "CMT subassemblies are the same 'class or kind' of merchandise as complete CMTs." Id.
 
 
 13
 In October 1985, the Administration published its final determination that "CMTs and subassemblies from Japan are being or are likely to be, sold in the United States at less than fair value...." Administration, Cellular Mobile Telephones and Subassemblies From Japan, Final Determination of Sales at Less Than Fair Value, No. A-588-405, 50 Fed.Reg. 45,447, 45,447 (Oct. 31, 1985). The Administration found that the weighted average of dumping margins for the respondents ranged from 2.99 to 106.60 percent. Id. at 45,460.
 
 
 14
 The Administration clarified and explained its definition of "subassemblies":
 
 
 15
 Subassemblies are any completed or partially completed circuit modules, the value of which is equal to or greater than five dollars, and which are dedicated exclusively for use in CMT transceivers or control units. The term 'dedicated exclusively for use' only encompasses those subassemblies that are specifically designed for use in CMTs, and could not used [sic], absent alteration, in a non-CMT device. The Department selected the five dollar value for defining the scope since this is a value that it has determined is equivalent to a 'major' subassembly. The Department feels that a dollar cut-off point is a more workable standard than a subjective determination such as whether a circuit module is 'substantially complete.' ... The presumption is that CMT subassemblies are covered by the order unless an importer can prove otherwise. An importer will have to file a declaration with the Customs Service to the effect that a particular CMT subassembly is not dedicated exclusively for use in CMTs or that the dollar value is less than $5, if he wishes it to be excluded from the order.
 
 
 16
 Id. at 45,448.
 
 
 17
 While the Administration's proceedings were pending, the Commission began its investigation of whether there was actual or threatened injury to a domestic industry. Two months after the Administration's final determination, the Commission held that "industries in the United States are materially injured by reason of imports from Japan of cellular mobile telephones and subassemblies thereof, ... which have been found by the Department of Commerce to be sold in the United States at less than fair value." Commission, Cellular Mobile Telephones and Subassemblies Thereof From Japan, Determination, No. 731-TA-207, 50 Fed.Reg. 51,467, 51,467-68 (Dec. 17, 1985).
 
 
 18
 The Administration then published its antidumping duty order covering CMTs and subassemblies as defined in its final determination. Administration, Antidumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan, No. A-357-405, 50 Fed.Reg 51,724 (Dec. 19, 1985).
 
 
 19
 The respondents subject to the order filed separate actions in the Court of International Trade, challenging the order, which the court consolidated. In a lengthy opinion, the court upheld the Administration's antidumping determination and antidumping order. Although the court remanded the case to the Commission for further proceedings with respect to one aspect of the injury determination, since that determination is not challenged on this appeal, we need not discuss that point. After the Commission's decision on remand, the court entered its judgment order, the subject of this appeal, which dismissed the action.
 
 
 20
 With respect to the issues the appellants here raise, the court rejected the argument that "the five dollar or more value attached to what constitutes a major subassembly is arbitrary and that a more reasonable standard should be one where major assemblies be judged upon their use in final assembly of CMTs." 700 F.Supp. at 558. The court stated:
 
 
 21
 In the investigation, the attention of the ITA [Administration] was attuned to any type of evasion of an antidumping order whether the subassemblies varied in size, type, value, or method of importation. The ITA recognized subassemblies imported in the form of kits, collections, or separates, dedicated exclusively for use in CMTs, although not constituting a "major" portion of the value or constituent part of a complete CMT, nevertheless could be quickly and easily assembled together and become a completed CMT. More importantly, the ITA determined the subassemblies and discrete subassemblies were "the class or kind of merchandise described in this petition," which determination has been sustained by the Court. While some of the subassembly components under investigation may be proportionately less in value or size than other subassembly components, the ITA decision to include those subassemblies and discrete subassemblies in the investigation was supported by substantial evidence on the record and otherwise in accordance with law.
 
 
 22
 700 F.Supp. at 558-59.
 
 II
 
 23
 The appellants do not challenge either the Administration's determination that they have sold CMTs and subassemblies in the United States at less than fair value, or the Commission's ruling that the dumping injured or threatened to injure a domestic industry. Nor do they attack the scope of the Administration's antidumping order insofar as it covers not only CMTs but also subassemblies. Their sole argument is that the Administration acted improperly in making the antidumping order applicable to subassemblies, the value of which is equal to or greater than five dollars. The argument has three facets.
 
 
 24
 A. The appellants first contend that the Court of International Trade erred in holding that substantial evidence supports the Administration's use of the five-dollar cutoff figure as the basis for determining the scope of the CMT subassemblies that the antidumping order covers. They assert that the Administration's rationale for using this figure was that all subassemblies above that value were "major" subassemblies, and that this conclusion was arbitrary and unwarranted and unsupported by substantial evidence because there is no indication that all subassemblies valued at five dollars or more constitute major subassemblies of a CMT.
 
 
 25
 The issue before us, however, is not whether substantial evidence shows that all subassemblies valued at five dollars or more are major ones, but whether the Commission acted within its discretion in adopting that figure. In the context of the Administration's purpose in making the antidumping order applicable to subassemblies, we view the five-dollar cutoff as essentially designed to exclude from the coverage of the order those assemblies that, because of their relatively low value, would have only a de minimis effect in terms of permitting evasion of the order.
 
 
 26
 In both its preliminary and final dumping determinations, the Administration explained that it included subassemblies in the investigation "since otherwise any resulting order could easily be circumvented" by importing the unassembled components into the United States and there assembling them into completed CMTs. As the Court of International Trade properly pointed out, the Administration was sensitive to "any type of evasion of an antidumping order whether the assembly varied in size, type, value, or method of importation." 700 F.Supp. at 558. The court also noted that at the time the antidumping order was issued, "the CMT industry was very young," so that the precise form and method of importation of components for assembly in the United States could not be known or precisely foretold. Id. at 554.
 
 
 27
 For those reasons, the Administration justifiably decided to make the antidumping order applicable to all subassemblies other than those of minimum value, because of the potential of all of those subassemblies to be used to evade the order. Although the appellants argue that subassemblies of relatively low value could not and would not be imported to evade the dumping order, we cannot say that the Administration's contrary determination was arbitrary or without adequate basis in the record.
 
 
 28
 The appellants argue, however, that Motorola's own filings with the Administration "leave little doubt that, from the standpoint of circumvention, it was concerned with what can only be described as truly large and significant subassemblies" (emphasis in original). The responsibility to determine the proper scope of the investigation and of the antidumping order, however, is that of the Administration, not of the complainant before the agency. For the reasons indicated, we have concluded that the Administration justifiably drew the line at subassemblies valued at five dollars or more.
 
 
 29
 Finally, the appellants refer to the provision in the recent Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, Sec. 1321, 101 Stat. 1107, 1192 (1988) (codified as 19 U.S.C. Sec. 1677j), that authorizes the Administration to make an antidumping order applicable to parts and components assembled in the United States where "the difference between the value of [the assembled article] sold in the United States and the value of the imported parts and components ... is small...." 19 U.S.C. Sec. 1677j(a)(1)(C) (1988). They assert that in light of this provision, the Administration's use of the five-dollar minimum value was arbitrary.
 
 
 30
 The short answer is that the 1988 statute has no applicability to this case, in which the antidumping order was issued in December 1985, more than two years before the effective date of the 1988 Act. See Pub.L. No. 100-418, Sec. 1337, 101 Stat. at 1211 (codified as 19 U.S.C. Sec. 1671 note). Moreover, the congressional decision in a subsequent statute to frame the Administration's authority to subject components assembled in the United States to antidumping orders on the basis of a comparison of the value of the assembled article and the individual components, sheds no light on the validity of the Administration's decision under an earlier statute to except from an antidumping order only components valued at less than five dollars.
 
 
 31
 The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the Administration has found lies largely in the Administration's discretion. Cf. Smith-Corona Group v. United States, 713 F.2d 1568, 1582 (Fed.Cir.1983). That discretion must be exercised in light of all the facts before the Administration and must reflect that agency's judgment regarding the scope and form of an order that will best effectuate the purpose of the antidumping laws and the violation found. Considering all the circumstances, we cannot say that the Administration abused its discretion or acted contrary to the record in concluding that the antidumping order should cover all subassemblies valued at five dollars or more.
 
 
 32
 B. The appellants next challenge the Administration's determination that subassemblies are the same class or kind of merchandise as CMTs.
 
 
 33
 The statute requires the imposition of an antidumping duty upon the "class or kind" of foreign merchandise the Administration determines has been dumped. 19 U.S.C. Sec. 1673. An antidumping order is required to describe the "class or kind" of merchandise which it covers. 19 U.S.C. Sec. 1673e(a)(2) (1982). The Administration's antidumping order covered CMTs and subassemblies as defined in the final determination.
 
 
 34
 In its final determination, the Administration concluded that "CMT subassemblies that are 'dedicated exclusively for use' in CMTs are the same 'class or kind' of merchandise as complete CMTs." It explained that:
 
 
 35
 This determination is based on a consideration of the following factors: (1) General physical characteristics, (2) the expectations of the ultimate purchasers, (3) the channels of trade in which the product is sold, (4) the manner in which the product is advertised and displayed, and (5) the ultimate use of the merchandise in question.... Since the scope of this investigation only includes those subassemblies that are "dedicated exclusively for use" in complete CMTs, both the ultimate use and the ultimate purchaser of the CMT subassemblies are the same as for the complete CMTs, since by definition, the CMT subassemblies could not be used in any other device. Thus, the second and the fifth criteria outlined above are met.
 
 
 36
 Similarly, based on the evidence in the record, the Department determines that CMT subassemblies, as defined in this investigation, and complete CMTs move in the same channel of trade. Indeed, this is the very reason the Department feels it necessary to include CMT subassemblies within the scope of this investigation since otherwise any resulting order could easily be circumvented. Those subassemblies manufactured in-house by CMT producers move in the same channels of trade as the CMT of which they are a part because such subassemblies are not "traded" except to the extent they are sold after they have been used in CMT production. While some CMT components may be purchased by CMT manufacturers from unrelated parties, the Department has reason to believe that such separately traded items may not meet the "dedicated exclusively for use" criteria, and therefore would not be covered by the scope of any order.
 
 
 37
 Similarly, since there is no separate channel of trade for CMT subassemblies, the only respect in which they are advertised and displayed is in the form of complete CMT units. Thus, the fourth criterion is met.
 
 
 38
 Finally, with respect to the first criterion, the Department does not think that the fact that CMT subassemblies have, in some respect, different physical characteristics from complete CMTs should be controlling in this instance. The only difference between the two is that complete CMTs are, essentially, assembled CMT subassemblies. As a result, the Department concludes that CMT subassemblies which are dedicated exclusively for use in CMTs are within the same "class or kind" of merchandise as complete CMTs.
 
 
 39
 50 Fed.Reg. at 45,448.
 
 
 40
 The appellants argue at length that these findings are not supported by substantial evidence. We conclude, however, that the Administration justifiably concluded, upon an adequate basis in the record, that subassemblies valued at five dollars or more and "dedicated exclusively for use" in CMTs, are the same "class or kind" of merchandise as the CMTs in which they ultimately are incorporated. In the portion of its final determination quoted above, the Administration convincingly explained the reasons for its "class or kind" ruling. The appellants have not shown that those conclusions were factually or legally erroneous.
 
 
 41
 The appellants also contend that the Administration's "class or kind" determination is fatally flawed because in its petition Motorola did not contend that an antidumping order is required to cover all subassemblies valued at five dollars or more. In its preliminary antidumping determination, the Administration rejected the appellants' earlier similar argument that Motorola's petition did not cover separate subassemblies. It stated that the appellants were "taking an unduly narrow reading of the petition" and that the Administration's conclusion "is simply a clarification of what was set forth in the petition." 50 Fed.Reg. at 24,555. The Administration also ruled that "whether or not Motorola's petition explicitly covers discrete subassemblies is not dispositive, since the Department has an inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent." Id.
 
 
 42
 These same conclusions are no less applicable to the narrower version of the argument that appellants make here.
 
 
 43
 C. Finally, the appellants contend that because in its final injury determination the Commission found that seven major subassemblies constituted separate industries that the dumping threatened to injure, the Administration's antidumping order was required to be similarly limited.
 
 
 44
 In its final injury determination, the Commission stated:
 
 
 45
 In this investigation there are also imports of CMT subassemblies. These subassemblies "compartmentalize" certain functions common to every CMT. The basic functions incorporated into one or more of the major subassemblies include: audio processing, signal processing (logic), frequency transmitting, frequency receiving, frequency comparing (synthesizing), duplexing (enabling sending and receiving at the same time), and power amplifying.
 
 
 46
 We determine that subassemblies dedicated to the performance of each of the essential functions of a complete CMT constitute a separate like product.
 
 
 47
 50 Fed.Reg. at 51,467 (footnotes omitted).
 
 
 48
 The Commission also concluded that there were "eight domestic industries": "One domestic industry consists of firms that manufacture complete CMTs or transceivers or control units. The other seven domestic industries consist of producers of the specified subassemblies for CMTs." Id.
 
 
 49
 The Commission's determination that the seven "major subassemblies" constituted separate products for determining whether the dumped imports injured an American industry does not mean that the Administration was required to limit its antidumping order to those seven categories of subassemblies. As we have indicated, under the statutory scheme, the Administration and the Commission have separate and different, although related, duties and responsibilities in the administrative process by which dumping investigations are conducted and antidumping orders are issued.
 
 
 50
 The Commission's role is to determine whether dumping injures or threatens to injure an American industry. In the present case, the Commission determined that there were eight domestic industries that the dumping injured: the CMT industry, and the separate industries producing the seven major subcategories of CMTs that it listed.
 
 
 51
 After the Commission made that determination, it was the responsibility of the Administration to frame an antidumping order that would rectify the dumping it found. We have upheld the Administration's determination that to prevent evasion, an appropriate order in this case should cover all subassemblies dedicated exclusively for use in CMTs valued at five dollars or more. There is no inconsistency between that determination and the Commission's determination that, for purposes of determining injury, each of the major subcategories it listed constituted a "separate like product," the manufacture of which constituted a separate domestic industry. The Commission's determination of like products and separate industries does not undermine the Administration's determination that to prevent evasion the antidumping order should be broader.
 
 CONCLUSION
 
 52
 The judgment of the Court of International Trade is AFFIRMED.
 
 
 
 *
 Richard Mills, of the United States District Court for the Central District of Illinois, sitting by designation