NITTA INDUSTRIES CORP. AND NITTA INTERNATIONAL, INC., PLAINTIFFS, AND ERNST SIEGLING AND SIEGLING AMERICA, INC., INTERVENOR-PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Court No. 90–03–00128

(Decided April 7, 1992)

*Hopkins & Sutter* (*Malcolm R. Pfunder* and *Alicia M. Serfaty*) for the plaintiffs.

*Covington & Burling* (*Harvey M. Applebaum, David R. Grace* and *Ellen K. Snyder*) for the intervenor-plaintiffs.

*Stuart M. Gerson*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*A. David Lafer*) and *Lisa Farringer*, Special Counsel to the Assistant Attorney General; and Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (*Pamela A. Green*), of counsel, for the defendant.

### MEMORANDUM

AQUILINO, *Judge*: Subsequent to publication of an antidumping-duty order *sub nom. Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan*, 54 Fed. Reg. 25,314 (June 14,

1989), and a similar order regarding the Federal Republic of Germany[1], Nitta Industries Corporation and Nitta International, Inc. requested that the International Trade Administration, U.S. Department of Commerce ("ITA") exclude nylon-core flat belts and spindle belts from the scope of the order for Japan.[2]

The ITA denied the request as to the flat belts and granted it with regard to the spindle belting in an unpublished ruling per the following analysis:

> In this case, we do not need to address the *Diversified Products* criteria because the descriptions found in the antidumping duty order and the ITC determinations are sufficient to evaluate Nitta's exclusion request.
>
> The written description of scope from the initiation of the investigation through the publication of the antidumping duty order included flat, corded belts. Likewise, cordless belts were not included in the scope during any phase of the investigation or the antidumping duty order. The written description of the scope remains dispositive, and the TSUSA and HTS categories are provided for the convenience of Customs. There is no characteristic or qualification about Nitta's nylon core belt that differentiates it from "flat belts * * * containing cord or strand" (54 FR 15486). Nitta's spindle belt is properly classified as a cordless belt and is therefore excluded from the scope, as both the ITC and the Department made clear.
>
> * * *[W]e determine that nylon core flat belts are within the scope of the antidumping duty order and that spindle belting is outside the scope of the antidumping duty order on industrial belts from Japan.

R.Doc 19, p. 3 (Feb. 12, 1990).

This action, brought pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), challenges that part of the ITA's determination which held nylon-core flat belts within the scope of its antidumping-duty order(s). The plaintiffs and the intervenor-plaintiffs have interposed motions for judgment on the agency record, alleging that the ruling is not supported by substantial evidence or otherwise in accordance with law.

The ruling makes reference to *Diversified Products Corp. v. United States*, 6 CIT 155, 572 F.Supp. 883 (1983), and the plaintiffs argue that the "late introduction of flat belts into this proceeding mandates that a

---

[1] *See* 54 Fed. Reg. 25,316 (June 14, 1989).

[2] *See* Record Document ("R.Doc") 15, which defined the merchandise more precisely as follows:

Nylon core flat belts are * * * a continuous, multilayer strip, composed of a nylon (polyamide) fabric or rubber (elastomer) surface, bonded to each side of a core consisting of oriented nylon sheet. Spindle belting is a flat, flexible band composed of synthetic fibers which have been coated, filled, or laminated with plastic or synthetic rubber. Spindle belts are cordless and do not have a tensile member * * *.

full *Diversified Products* analysis be conducted".[3] But such analysis applied in that and subsequent cases to later-developed merchandise, and the ITA has not been held obligated to apply the criteria to pre-existing goods like the nylon-core belts herein. *See, e.g., PPG Industries, Inc. v. United States*, 15 CIT 99, 759 F.Supp. 834 (1991). *See also* 19 U.S.C. § 1677j(d) (1988). On the other hand, as the ruling itself indicates, the agency has been at liberty to rely on *Diversified Products* as an aid in determining the coverage of such goods. *Cf. Floral Trade Council of Davis v. United States*, 13 CIT 638, 640 n. 3, 716 F.Supp. 1580, 1582 n. 3 (1989). Indeed, the plaintiffs refer this court to 19 C.F.R. § 353.29(i), which provides that the ITA "will * * * consider" in proceedings like these the physical characteristics of the product, the expectations of the ultimate purchasers, the ultimate use of the product and its channels of trade. That provision, however, was published on March 9, 1990, or after the ruling herein had been rendered. *See* 55 Fed. Reg. 9,046, 9,049. Moreover, as promulgated, the regulation provides that the agency "will take into account" first the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations by it and the ITC and that only when these criteria are not decisive will the foregoing factors be considered.

Here, the ITA held the first-rank criteria to be dispositive. Its initiation notice and other determinations specify flat belts *viz. Initiation of Antidumping Duty Investigation; Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan*, 53 Fed.Reg. 28,036 (July 26, 1988) ("These include V-belts, synchronous belts, round belts and flat belts"), *Preliminary Determination of Sales at Less Than Fair Value: Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan*, 54 Fed.Reg. 5,114, 5,115 (Feb. 1, 1989) (same), *Final Determination of Sales of Less Than Fair Value: Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan*, 54 Fed. Reg. 15,485, 15,486 (April 18, 1989) (same), while the resultant antidumping-duty order states that the covered merchandise

> includes industrial belts used for power transmission. These include industrial belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand, and whether in endless (*i.e.*, closed loops) belts, or in belting in lengths or links. This investigation excludes conveyor belts and automotive belts as well as front engine drive belts found on

---

[3] The defendant takes the position that the plaintiffs may not press this point now because they did not raise it below. This stance, however, is neither supported by the record [*see, e.g.*, R.Docs 7, 15] nor by the challenged ruling on its face, which states:

> On matters concerning the scope of an order, our primary bases for determining whether or not a product is covered are the descriptions of the product contained in the order, the U.S. International Trade Commission's (ITC) and Department's preliminary and final determinations, and the petition. When we cannot make a determination based on these documents, we use four additional criteria[:] * * * the physical characteristics of the merchandise, the ultimate use of the merchandise, the expectations of the ultimate purchaser, and the channels of trade in which the merchandise moves. These are the criteria used by the Department and upheld * * * in *Diversified Products Corp. v. United States* * * *, as modified by *Kyowa Gas Chemical Industry Co. Ltd. v. U.S.*, 7 CIT 138, 582 F.Supp. 887 (1984).

equipment powered by internal combustion engines, including trucks, tractors, buses, and lift trucks.

54 Fed. Reg. at 25,315, as corrected, 54 Fed.Reg. 32,104 (Aug. 4, 1989).

As for the ITC, before which Nitta appeared and participated, the commissioners had opted for five different definitions of like product, apparently upon an understanding that "past Commission decisions have made clear that the like product can contain articles not included within the scope of the investigation". Views of Commissioner Rohr, R.Doc 11 at 27. Thus, despite an attempt by the petitioner not to include automotive belts, Chairman Brunsdale and Commissioner Rohr divided the merchandise into three like products encompassing both automotive and industrial belts, namely, synchronous belts, V-belts, other belts, with the last category covering flat belts and round belts. Vice Chairman Cass also based his analysis on three product categories: V-belts and round belts, synchronous belts, flat belts. Commissioners Eckes and Newquist took "all industrial belts"[4] into account, while Commissioner Lodwick considered "all power transmission belts, both for industrial and automotive uses." *Id.* at 10.

Under 19 C.F.R. § 353.36(a)(4) (1988), antidumping petitions had to contain a "detailed description of the imported merchandise in question, including its technical characteristics and uses, and, where appropriate, its tariff classification under the Tariff Schedules of the United States". In its petition herein, The Gates Rubber Company requested imposition of antidumping duties on all industrial belts for power transmission, specifically V-belts, which have a cross section like a "V" or wedge, and synchronous belts, which have teeth. The petition makes reference to TSUS items and then states that those classifications

> in fact include imports of all categories of industrial power transmission belts, including timing or synchronous belts. Because of the evolution in the design of certain industrial power transmission belts, including timing or synchronous belts, such belts may no longer exemplify the typical V- or wedge-shaped cross section. Accordingly, under a literal construction of the structure of TSUS 358.05–358.16, such belts might be classified as "other belting and belts for machinery" in accordance with the various fiber or fiber/rubber or fiber/plastic content. In addition, were industrial power transmission belts containing steel wire and rubber or plastics to be deemed to be in chief value of steel wire, classification might be made under TSUSA 657.2520. Finally, if industrial power transmission belts not characterized by a V- or wedge-shaped cross section were to be entered at Customs under a description of "not containing textile fibers", they might be classified under TSUSA 773.3510. It is petitioner's understanding derived from its participation in the RMA Statistical Program that the only machine belts in fact entered under the TSUS and TSUSA items mentioned in

---

[4] R.Doc 11 at 10.

this paragraph are conveyor belts. Conveyor belts are not included within the scope of this petition.[5]

In addition, the petitioner was required to name the "country or countries from which the merchandise is being, or is likely to be, exported to the United States and, if the merchandise is produced in a country other than that from which it is exported, the name of the country in which it is produced" and also the "names and addresses of all known foreign enterprises believed to be manufacturing, producing or exporting the merchandise in question". 19 C.F.R. § 353.36(a)(5) and (6) (1988). Japan (and West Germany) were thus named herein, but neither Nitta (nor Siegling) was identified as a known foreign enterprise[6] or as one believed to be importing the merchandise within the meaning of section 353.36(a)(11). Furthermore, the petitioner had to provide "[a]ll pertinent facts as to the price at which the foreign merchandise is sold or offered for sale in the United States and in the home market in which produced or from which exported". 19 C.F.R. § 353.36(a)(7) (1988). Gates supplied such information with respect to various types of belts exported by the enterprises identified pursuant to the regulations. Finally, for purposes of section 353.36(a)(13) (information as to material injury or threat thereof), the petition defined like product — broadly.

Notwithstanding such regulations, a petitioner is not required to circumscribe the entire universe of articles which might possibly be covered by the order it seeks. *American NTN Bearing Manufacturing Corp. v. United States*, 14 CIT at 320, 327–28, 739 F.Supp. 1555, 1562 (1990). According to the plaintiffs, at the time the petition was filed, Nitta and Gates were engaged in a joint venture, and Nitta was not served with a copy.[7] They claim the first indication that their products were covered by the investigation was a U.S. Customs Service telex's addition of 14 more HTS numbers to the ITA's preliminary determination.[8] The initiation notice had listed 12 TSUS items as well as four HTS subheadings identified in the petition, pointing out that Congress was then considering conversion of the TSUS to the HTS. 53 Fed. Reg. at 28,036. The preliminary determination had set forth only the four HTS numbers, although it contained the same description of the merchandise as the initiation notice and stated that the written description was dispositive. 54 Fed.Reg. at 5,115. Nitta had received a copy of this determination from a Gates attorney but allegedly concluded that those four numbers did not cover its products. *See* R.Doc 6 at 2.

---

[5] R.Doc 1 at 32. Four subheadings from the Harmonized Tariff System ("HTS") were also specified.

[6] According to the plaintiffs, the Japanese firms named by Gates manufactured and exported V- and synchronous belts but not flat belts.

[7] 19 C.F.R. § 207.10(b) (1988) required service of a petition on all enterprises believed to be manufacturing, producing or exporting, or importing, the merchandise. Nitta received a copy of the ITA questionnaire served on the foreign exporters identified by Gates for voluntary response. According to the plaintiffs, it was sent at the request of Gates, although the defendant and the preliminary ITA determination claim that it was requested by Nitta. *Compare* R.Doc 15, pp. 4–5 *and* Plaintiffs' Memorandum, p. 4 n. 1 *with* defendant's memorandum, pp. 6–7 *and* 54 Fed.Reg. at 5,115.

[8] *See* R.Doc 6 at 2. The plaintiffs admit that those additional classification numbers "included all of the products imported by Nitta International from Japan." *Id.*

However, counsel confirmed that "Gates intended its petition to include the flat belts imported by Nitta". *Id.* at 3. Nitta thereupon stated its "desire to explore every possible avenue of cooperation with ITA and ITC staff"[9], claiming that it knew of no domestic producer of nylon core flat belts and that Gates was not a competitor. Thereafter, it filed a request to exclude nylon-core flat belts and spindle belts from the proceedings. Gates opposed such exclusion. R.Doc 8. However, when Nitta raised the issue of scope before the ITC, the petitioner chose not to render opposition. *See* R.Doc 15 at 7–8. *Cf.* R.Doc 11 at 62–63. According to the plaintiffs, a Gates executive informed them that its counsel had apprised the Commission that Gates had no argument with Nitta's position and did not oppose a no-injury finding with respect to the nylon-core flat belts. *See* Plaintiffs' Memorandum, p. 9; R.Doc 15 at 7–8.

Against this background, the ITA issued its final determination, which included the original TSUS items and the 18 HTS subheadings identified in the telex. The agency explained that it was the petitioner which had requested the addition of the 14 HTS numbers which reflected "concordance between TSUSA item numbers and HTS subheadings listed in a January 1989 USITC publication." 54 Fed. Reg. at 15,487. Its product description was identical to the one found in the initiation notice and in the preliminary determination. With respect to Nitta's exclusion request, the ITA stated [*id.*]:

> * * * The information received was insufficient to determine whether the merchandise is properly excluded from the scope of this investigation. In addition, the information received * * * arrived too late to be analyzed and verified for this final determination. If the final determination of the ITC results in an antidumping duty order on this merchandise, and upon receipt of proper documentation, the Department may conduct a scope ruling procedure concerning the products imported by these firms.

Nitta thereupon requested such a scope ruling procedure, the result of which is now before the court. Shortly before that request was filed, the petitioner had sent the following letter to the ITA:

> The Gates Rubber Company * * * does not oppose, and in principle supports, the request filed by Nitta Industries Corp. * * * seeking exclusion of nylon core flat belts and spindle belting from the scope of the antidumping order issued in these proceedings on June 7, 1989. Gates did not intend that either of these products be covered by its petition, or that the Department include these products within the scope of its investigation.

> Nitta correctly points out that Gates' petition does not mention either flat belts or Nitta. The July 19, 1988 letter, from our counsel * * * to * * * the Commerce Department, confirming "the intended

---

[9] R.Doc 6 at 4.

product coverage" of the petition to be "industrial power transmission belts," mentioned "flat-shaped" belts, but was not intended to include either nylon core flat belts or spindle belting.[10]

The ITA called for comments, and Siegling responded in full support of Nitta. R.Doc 17 at 3. Nonetheless, as set forth above, the agency concluded that nylon-core flat belts are within the scope of its order while spindle belts are not.

In reaching such a determination, the ITA has broad discretion, although it "must be exercised in light of all the facts before the Administration and must reflect that agency's judgment regarding the scope and form of an order that will best effectuate the purpose of the antidumping laws and the violation found." *Mitsubishi Electric Corp. v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990). In this action, whatever the ambivalence on the part of the petitioner or its 274-page petition, from the beginning the ITA stated that the scope of its investigation would cover certain industrial belts for power transmission, including "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand". *Initiation of Antidumping Duty Investigation; Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan, supra*. Its approach did not waiver and was in accordance with law. When filed, the petition stated that there was "significant overlap" between the categories of industrial belts for power transmission, and the record which developed provides substantial support for this proposition. Hence, the motions of the plaintiffs and the intervenor-plaintiffs for judgment on the agency record, both of which admit that the petition was "over-broad"[11] and a "broad formulation"[12], must be denied and this action dismissed.

---

[10]R.Doc 14. The July 19, 1988 letter referred to is not in the administrative record while the April 10, 1989 letter [R. Doc 8] opposing Nitta's first exclusion request is not explained. Be that as it may, the quality of the written submissions on all sides obviated any need for oral argument.

[11]Plaintiffs' Memorandum, p. 2.

[12]Brief of Plaintiff-Intervenors, p. 4.