IWATSU ELECTRIC CO., LTD., and Iwatsu America, Inc.; Toshiba Corporation and Toshiba America Information Systems, Inc.; Matsushita Electric Industrial Co., Ltd., Matsushita Communications Industrial Co., Ltd., Kyushu Matsushita Electric Co., Ltd., and Matsushita Electric Corporation of America; Goldstar Telecommunication Co., Ltd.; Samsung Electronics Co., Ltd.; Oriental Precision Co., Ltd.; Inter-Tel Inc.; Executone Information Systems, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

American Telephone and Telegraph Co., Defendant–Intervenor.

No. 90–01–00016.

United States Court of International Trade.

Feb. 15, 1991.

Skadden, Arps, Slate, Meagher & Flom, Thomas R. Graham, William E. Perry and John J. Burke, Washington, D.C., for Iwatsu Elec. Co., Ltd. and Iwatsu America, Inc.

Mudge, Rose, Guthrie & Ferdon, N. David Palmeter and Jeffrey S. Neeley, Washington, D.C., for Toshiba Corp. and Toshiba America Information Systems, Inc.

Weil, Gotshal & Manges, A. Paul Victor, Jeffrey B. Bialos and Martin S. Applebaum, New York City, for Matsushita Elec. Indus. Co., Ltd., Matsushita Communication Indus. Co., Ltd., Kyushu Matsushita Elec. Co., Ltd. and Matsushita Elec. Corp. of America.

Dow, Lohnes & Albertson, William Silverman, Michael P. House and Barry A. Pfeifer, Washington, D.C., for Goldstar Telecommunication Co., Ltd., Samsung Electronics Co., Ltd. and Oriental Precision Co., Ltd.

Crowell & Moring, C. Michael Hathaway, Jean–Pierre Swennen and Eduardo Maldonado, Washington, D.C., for Inter–Tel, Inc.

Hunton & Williams, William F. Young, Lynda M. Rozell and Eric J. Murdock, Washington, D.C., for Executone Information Systems, Inc.

Lyn M. Schlitt, Gen. Counsel, Judith M. Czako, Acting Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Stephen A. McLaughlin, Washington, D.C., for defendant.

Covington & Burling, Harvey M. Applebaum, O. Thomas Johnson, Jr., Sonya D. Winner and Susan L. Burke, Washington, D.C., for defendant-intervenor.

OPINION

RESTANI, Judge:

Plaintiffs, producers and importers of small business telephone systems from Japan and Korea, challenge the final affirmative determinations of the United States International Trade Commission ("ITC") in *Certain Telephone Systems and Subassemblies Thereof from Japan and Taiwan,* Inv. Nos. 731–TA–426 and 428 (Final) (November 1989) ("Japanese Final Determination"), USITC Pub. No. 2237; 54 Fed. Reg. 50,446 (December 6, 1989) and *Certain Telephone Systems and Subassemblies Thereof from Korea,* Inv. No. 731–TA–427 (Final) (January 1990) ("Korean Final Determination"), USITC Pub. No. 2254; 55 Fed.Reg. 4,248 (February 7, 1990) [1] that imports into the United States of small business telephone systems ("SBTSs") and subassemblies from Japan, Taiwan and Korea, which were found to be sold at less than fair value ("LTFV"), have caused material injury to the domestic industry that produces a like product.[2] Plaintiffs argue that the final determinations, which were based on the affirmative votes of three of six commissioners,[3] are not supported by substantial evidence. Accordingly, plaintiffs seek reversal of the final determinations.

For the following reasons, the court finds the final determinations of ITC are supported by substantial evidence in the record and are otherwise in accordance with law. Plaintiffs' motion for judgment on the agency record is therefore denied and this action is dismissed.

*Background*

I. The SBTS Market

On December 28, 1988, American Telephone and Telegraph Company ("AT & T")

---

1. The investigations of imports from these three countries were instituted simultaneously, but ITC extended the final investigation regarding Korean imports and issued a separate determination for Japanese and Taiwanese imports. ITC, however, decided to cumulate imports from all three countries and the Korean Final Determination specifically incorporates by reference the reasoning and findings contained in ITC's final determination on imports from Japan and Taiwan. The "final determinations" referred to in this opinion will be both the Japanese Final Determination and the Korean Final Determination.

2. The Department of Commerce made separate findings that sales were at LTFV. That decision is not immediately before the court. See *infra,* discussion at 1508–09.

3. Affirmative votes of three of six commissioners are sufficient to support a final affirmative determination. See 19 U.S.C. § 1677(11) (1988).

together with Comdial Corporation filed an antidumping petition pursuant to Section 735 of the Tariff Act of 1930, as amended, charging that AT & T, the principal domestic producer of SBTSs, and other domestic producers were injured by imports of LTFV SBTSs and subassemblies thereof from Japan, Taiwan and Korea. The imported articles under investigation here consist of both subassemblies, a component product, and the SBTS, a finished telephone system. ITC limited its dumping inquiry to SBTSs capable of internal or intercom calling and having a total non-blocking[4] port[5] capacity of between 2 and 256 ports. Subassemblies were defined to consist of (1) control and switching equipment, (2) power supplies, (3) other circuit cards and modules, and (4) telephone sets and consoles. Each of these parts is dedicated for use in an installed system produced by the same manufacturer. In the SBTS market as a whole, the various subassemblies differ greatly from one another. There is also wide variance within the product lines of each individual producer.

SBTSs ultimately are sold either directly to an end user or to an interconnect[6] or distributor who, in turn, sells the equipment to the end user. AT & T sells most of its equipment directly to the end user using its own internal distribution system. Final Staff Report ("Final Staff Rep.") at A–121. The foreign producers, in contrast, generally market their product at the wholesale level, selling to interconnects and distributors. *Id.* at A–122. Thus, as ITC found, "competition at the end user level is primarily between AT & T and interconnects." Japanese Final Determination ("Japanese Final Det.") at 39.

## II. Administrative History

On February 8, 1989, ITC unanimously determined, after conducting its preliminary investigation, that there was a reason-

able indication that the domestic SBTS industry was being materially injured by reason of imports of certain telephone systems and subassemblies from Japan, Taiwan and Korea. *See Certain Telephone Systems and Subassemblies Thereof From Japan, Korea, and Taiwan,* Inv. Nos. 731–TA–428 (Preliminary) USITC Pub. No. 2156 (Feb. 1989). In making its preliminary determination, ITC defined the domestic "like product" (that comparable to the class of imports under investigation) as all systems and subassemblies dedicated for use in an SBTS and defined the domestic industry as the producers of such systems and subassemblies. After examining the financial performance data submitted by AT & T, which represented virtually the entire domestic industry, and specifically noting certain declines in profits, production and shipments, ITC found a reasonable indication of material injury. *Id.* at 31. In addition, ITC decided to cumulate the volume and effect of imports from Japan, Korea and Taiwan for the purposes of examining the causal connection between the material injury to the domestic industry and the imports. *Id.* at 32–35.

In rendering its preliminary affirmative determination on causation, ITC relied on its finding that "the volume of imports and the increase of market share of imports relative to domestic like product are significant and probative of a reasonable indication of a causal connection between the allegedly LTFV imports and the material injury being experienced by the domestic industry." *Id.* at 36. Regarding price, ITC noted that the available data "shed somewhat limited light on the effects of imports on prices ..." *Id.* at 37. ITC observed that direct price comparisons between the subject imports and domestic like product were difficult because price data for the domestic product were provided for SBTSs

---

**4.** When a system has reached the total number of connections possible and a call is attempted, the requesting telephone receives a dial tone. This is referred to as call blocking. A system's maximum non-blocking capacity is defined in terms of the capacity at which a communication path will always exist for each attached station.

**5.** A port is a point of access in a system and may be either internal or external. The majority of SBTSs have less than 40 ports.

**6.** An interconnect is a dealer at the wholesale level of distribution who sells his product through sales representatives. Final Staff Report at A–122 n. 130.

on the installed systems level, whereas imported prices were at the basic equipment level. ITC did find, however, that "the data show a general decrease in prices of both domestic and imported systems over the period under investigation ..." *Id.* at 39.

Following ITC's preliminary determination, the Department of Commerce ("Commerce") commenced its investigations of whether the imports from the subject countries were sold at LTFV. On October 11, 1989, Commerce rendered final ITC determinations that there were LTFV sales imports from Japan and Taiwan. *See Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Japan,* 54 Fed.Reg. 42,541 (Oct. 17, 1989); *Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Taiwan,* 54 Fed. Reg. 42,543 (Oct. 17, 1989). After extending the proceeding concerning imports from Korea, Commerce concluded that imports from Korea were likewise being sold at LTFV. *See Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Korea,* 54 Fed.Reg. 53,141 (Dec. 27, 1989).

On August 2, 1989, ITC commenced its final injury investigation. As noted earlier, ITC ultimately concluded that the domestic industry producing equipment dedicated for use in SBTSs was materially injured by reason of LTFV imports from Japan, Taiwan and Korea. Plaintiffs challenge the final ITC determinations. Specifically, plaintiffs contend that the financial data submitted by AT & T to ITC for use in the investigation was manipulated by AT & T and, as such, should not have been relied upon by ITC. Plaintiffs also object to ITC's final determinations on the grounds that the price data cited by ITC in its causation analysis was flawed, that other supportive data in the record was not the basis of the determinations, and, in any case, such data is insufficient to support an affirmative determination.

*Discussion*

**I. Legal Background**

The standard to be applied by this court in reviewing a final ITC determination is whether it is in accordance with law and is supported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence" has been defined as follows:

> Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ... [It] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

*Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) and *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). As the trier of fact, ITC must assess the quality of the evidence and give such weight to the evidence as it believes is justified. The court's inquiry is limited to legal issues and an assessment of whether substantial evidence supports the determination.

■ United States antidumping law delegates to ITC the responsibility for making a final determination of whether:

> (A) an industry in the United States—
> (i) is materially injured, or
> (ii) is threatened with material injury, or
> (B) the establishment of an industry in the United States is materially retarded,

by reason of imports ... of the merchandise with respect to which the administering authority [has rendered a final affirmative determination that sales were at LTFV] ...

19 U.S.C. § 1673d(b)(1) (1988). Thus, antidumping relief is granted if ITC finds, first, that the domestic industry has been

materially injured or threatened with material injury and, second, that the injury is attributable, at least in part, to imports in the class found by Commerce to have been sold at LTFV.

In examining this causal connection between imports and the material injury, Congress has directed ITC to determine whether a class of imports sold at LTFV is causing injury. This court has held that the statutory language does not dictate that the injury be traced back to the particular sales found to be at LTFV, nor does it require that ITC demonstrate that dumped imports, through the effects of particular margins of dumping, are causing injury. Rather, ITC must examine the effects of imports of a *class* or *kind* of merchandise which is found to be sold at LTFV and make its conclusion about causation accordingly. *See e.g., Algoma Steel Corp., Ltd. v. United States*, 12 CIT ——, ——, 688 F.Supp. 639, 645 (1988), *aff'd*, 865 F.2d 240 (Fed.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989). The commissioners voting in the affirmative appear to accept this standard. The court need not examine the views of the dissenters in detail, although it appears that one of the dissenters did not utilize this standard.

II. Material Injury Caused by LTFV Imports

■ The court will examine injury and causation separately. That is the framework used in the final affirmative determinations, and such a framework has been accepted previously by the court. References to ITC or to its determination are to the affirmative determinations contained in the Japanese Final Determination and not to views of dissenting commissioners.

*A. Evidence in the Record Regarding Existence of Material Injury*

The first prong of the inquiry undertaken by ITC involves an assessment of the condition of the domestic industry. Under this prong, the domestic industry must be experiencing a material injury. "Material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1988).

In this case, after expressly examining domestic consumption, domestic production, capacity, capacity utilization, shipments, inventories, employment and financial performance pursuant to 19 U.S.C. § 1677(7)(C)(iii), ITC noted that "[t]he financial condition of the domestic industry can only be characterized as very poor throughout the period of investigation." Japanese Final Det. at 23. ITC also stated that

Consideration of all the indicators relating to the condition of the domestic industry leads us to conclude that the industry is experiencing material injury. Shipments are declining, inventories have built up. There have been significant adverse trends in employment. Most importantly, financial data show inadequate operating margins and an insufficient cash flow to fund necessary investment in the maintenance, modernization, and expansion of domestic production facilities and the development of the next generation of products.

*Id.* at 25. In other words, ITC based its conclusion on four findings: (1) overall domestic shipments of SBTSs and subassemblies declined; (2) inventories increased; (3) employment levels, hours worked, and total compensation declined; and (4) poor operating margins existed and therefore the cash flow necessary for maintenance and growth was absent.

■ Although these findings alone provide sufficient support for ITC's affirmative injury determination, it should be emphasized that ITC need not find all economic indicators to be negative to make a finding of material injury. The legislative history of the 1979 amendments to the antidumping statute states that ITC has the authority to weigh each factor in light of the circumstances:

*The significance of the various factors affecting an industry will depend upon the facts of each particular case.* Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to

whether an industry is materially injured, and *the significance to be assigned to a particular factor is for the ITC to decide.*

S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in,* 1979 U.S.Code Cong. & Admin.News 381, 474 (emphasis added). *See also Copperweld Corp. v. United States,* 12 CIT ——, ——, 682 F.Supp. 552, 562 (1988) (where the court quotes the legislative history and observes that ITC may assign a varying degree of significance to a factor depending upon the facts of a particular case).

Plaintiffs, however, contend that the record evidence of the financial performance of the domestic industry is flawed and nonprobative of whether material injury exists.[7] Because, in the context of the ITC investigation, the financial performance of AT & T played the most significant, if not dominant, role, plaintiffs base their objections on internal data and questionnaire responses submitted by AT & T. *See* Memorandum of Points and Authorities Submitted By Plaintiffs Iwatsu Electric Co., Ltd., et al., Toshiba Corporation, et al. and Matsushita Electric Industrial Co., Ltd., et al. ("Japanese Brief") at 94–96. The alleged inadequacies of the AT & T financial performance data, however, do not undermine the finding of material injury which is not seriously contested and which, in fact, plays a small role in the dispute at hand.

In addition, some of plaintiffs' objections are based more on the form of AT & T's financial data than on its substance. The allegation that AT & T misallocated revenues and selling, general and administrative ("SG & A") expenses between that portion of its business that produces the like product and its other lines of business, even if true, would not alter the fact that other factors firmly support a finding of material injury. The SG & A issue does, however, relate to plaintiffs' causation argument. *See infra* at 1512.

Plaintiffs also assert that ITC did not adequately investigate AT & T's financial data. Most importantly, plaintiffs allege that unexplained significant changes in the multiple versions of AT & T's questionnaire responses indicate that AT & T improperly manipulated its financial data. Japanese Brief at 6, 94–96. AT & T's data, which provided the basis for its responses to the ITC questionnaire, were verified by ITC in an extensive on-site verification. Changes in AT & T's questionnaire responses from the preliminary investigation to the final investigation to the final verified version are all directly attributable to the fact that ITC requested certain changes to reconcile AT & T's questionnaire data with its audited financial statements.[8] ITC staff requested AT & T to use different methodologies in calculating their figures and, therefore, AT & T's different responses do not constitute impermissible "manipulation."

---

**7.** Plaintiffs also attack ITC's material injury determination on the grounds that ITC discussed the financial condition of the domestic industry as *a whole* including rental aspects, but concluded that the *rental* market was only indirectly relevant to its injury investigation. Plaintiffs' Reply Brief Submitted By Iwatsu Electric Co., Ltd., et al., Toshiba Corporation, et al. and Matsushita Electric Industrial, Ltd., et al. ("Japanese Reply Brief") at 9–11. (The most relevant effect of the rental market decline likely was the additional pressure it put on performance in the sales market. It is simply a background factor.) Plaintiffs allege ITC might have erroneously found injury based on the rental market. *Id.* at 10. As support for their position, plaintiffs cite *Maine Potato Council v. United States,* 9 CIT 293, 300–01, 613 F.Supp. 1237, 1244 (1985) where the court remanded an ITC determination because the court was unable to determine which of two opposite conclusions had been reached by ITC. Plaintiffs' contention may be dismissed easily

because ITC specifically held that "the domestic industry ... is experiencing material injury *regardless* of how one analyzes the significance of rental operations." Japanese Final Det. at 59 (emphasis added). ITC analyzed the financial condition of the domestic industry apart from the rental operations, finding that its performance was "very poor." *Id.* at 23. Its decision rested on the condition of the domestic industry exclusive of the rental operations, however, ITC could have determined, as it did, that the rental market was indirectly relevant and, as such, warranted some attention.

**8.** ITC staff expressly verified the SG & A expenses supplied by AT & T. Verification Report, L2 Doc. 98T at 6. Moreover, in the notes accompanying the verification report, the ITC staff explained that they themselves were requesting certain changes in the methodology used to allocate SG & A expenses. *Id.* at 9.

In sum, the court is not persuaded that the manner of AT & T's presentation of financial data led to any significant error by ITC. In this case, ITC found that several factors clearly evidenced the poor condition of the domestic industry. Given the exhaustive and comprehensive nature of the investigation and the convincing nature of the economic data revealed in the staff report, plaintiffs' attempts to persuade this court that ITC's view of the condition of the industry is unsupported, fail.

### B. Material Injury "By Reason Of" the LTFV Imports

Upon finding material injury to the domestic industry, ITC turned to the second prong of the inquiry, namely, the nexus requirement.

Plaintiffs claim that any injury suffered by AT & T was the result of its own lack of cost management, inherited from its monopolistic period, and that imports were not the cause of injury. Plaintiffs contend that the financial performance records compiled by ITC indicate that AT & T had enormous unnecessary expenses (reflected largely in SG & A expense data) and thus was not competitive with the more efficient foreign producers. Japanese Brief at 111–115. ITC found, however, that, in comparison with other producers, AT & T's SG & A expenses were "largely attributable to AT & T's captive distribution and marketing efforts, expenses normally incurred by interconnects, not foreign producers." Japanese Final Det. at 61. As noted earlier, *supra* at 1508, AT & T is vertically integrated and sells its product directly to the end user using its own internal distribution system. Importers and other smaller domestic producers sell their product at the wholesale level. As such, AT & T could be expected to incur many costs that other producers escape. Plaintiffs argue that distribution and marketing cannot account for all of the difference. This may be true, but it does not alter the outcome because ITC did not base its nexus determination on an assumption that AT & T was very efficient; it concluded that even if AT & T's SG & A expenses were unusually high due to inherited structural problems,[9] *the woes of the domestic industry were exacerbated by LTFV imports.* Japanese Final Det. at 61. The basis for this key conclusion is discussed *infra.*

Thus, AT & T cost and expense problems are not an area which concerns the court greatly, because ITC did not ignore AT & T's internal problems, it accepted them as one cause of injury.[10] The question remaining to be answered and the only one of real concern is on what evidence did ITC base its finding that LTFV imports were one cause of material injury—the nexus problem.

As provided by statute, in making its determination that the material injury is "by reason of" the LTFV imports, ITC is required to consider, *inter alia,* the volume of imports of the merchandise, the effect of such imports on prices of like products in the United States and the impact of such imports on domestic producers of like product. 19 U.S.C. § 1677(7)(B)(i) (1988). In its final determination ITC examined both the volume and the price effects of the subject LTFV imports and drew conclusions about their impact on the domestic industry. The court cannot envision a case in which cau-

---

**9.** There is some evidence noted in the staff report that SG & A did not decline with costs because of the efforts needed to make new sales in this market. Final Staff Rep. at A–80.

**10.** In this regard plaintiffs place undue reliance on two internal AT & T documents in an attempt to prove that the financial problems within the domestic industry were directly traceable to inefficiency and poor sales performance within AT & T rather than the presence of LTFV imports. *See* Japanese Brief at 104–06, Joint Brief of Certain Plaintiffs Submitted By Goldstar Telecommunication Co., Ltd., et al.,

Executone Information Systems, Inc. and Inter-Tel, Inc. ("Korean Brief") at 81–93. Clearly these documents, intended for distribution among AT & T employees, sought to encourage the readers to improve their performance. The documents were never intended to be a complete explanation of all of the factors which coalesced to make the domestic SBTS industry what it is. Evidence that AT & T sought to improve its internal structure and performance in order to maintain its competitiveness does not undermine ITC's findings as to the impact of LTFV imports on the domestic industry.

sation could be proven by volume alone. If that is a theoretical possibility, it is not a theory which was invoked by ITC. ITC relied on both volume and price data and its conclusions as to each will be reviewed.

### 1. Volume of Imports

The statutory directive issued to ITC instructs it to consider whether the volume of imports of the subject merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant. 19 U.S.C. § 1677(7)(C)(i) (1988).

ITC openly acknowledged that data comparison problems existed which made it difficult to compare the level of shipments of SBTSs and subassemblies. Japanese Final Det. at 44.[11] Ultimately, however, ITC concluded that "[h]owever calculated, the market penetration of LTFV imports is significant." *Id.* Finding the *quantity* data on subassemblies to be the more probative in determining overall market shares of the domestic industry and imports, ITC chose not to emphasize market share by *value. Id.*[12] In quantity terms, imports of telephones generally increased. Final Staff Rep. at A–111, Table 29. Market pen-

etration figures for two important segments of the SBTS industry, control and switching equipment and telephones,[13] were at high levels, generally exceeding fifty percent, *see id.* at A–116, Table 31 and A–119, Table 33, although imports of control and switching equipment declined during the period. *Id.* at A–105, Table 26.

■ ITC's focus on the level of market penetration finds support in the language of the statute, which instructs ITC to analyze the volume of imports in either a relative *or* absolute sense depending on the requirements of that particular case. *See* 19 U.S.C. § 1677(7)(C)(i) (1988). This focus is consistent with ITC's discretion to consider levels of import penetration as one factor among the many that affect the domestic industry. *See Copperweld Corp. v. United States,* 682 F.Supp. at 571; *see also SCM Corp. v. United States,* 4 CIT 7, 13, 544 F.Supp. 194, 199 (1982). Furthermore, it is the significance of the volume or market share in terms of the particular industry that is critical. *See USX Corporation v. United States,* 11 CIT 82, 85, 655 F.Supp. 487, 490 (1987) ("Congress, this court, and ITC itself have repeatedly recog-

**11.** Toshiba America Information Systems, Inc., argues that ITC included certain large telephone systems and "dual use telephones" in the import data, whereas these imports should not have been within the class or kind of merchandise investigated by Commerce. *See* Brief Submitted By Toshiba Corp. and Toshiba American Information Systems, Inc. ITC had sufficient reasons for concluding that since Toshiba had raised this scope issue only after Commerce rendered its final LTFV determination, ITC was not obligated to reconsider the scope of the investigation. Support for ITC's determination is found in *Kokusai Electric Co., Ltd. v. United States,* 10 CIT 166, 172, 632 F.Supp. 23, 28 (1986), where the court held that an importer, in an effort to upset a final determination, could not raise a scope issue after Commerce ended its investigation. The court rejects plaintiffs' arguments that *Kokusai* is inapplicable to the case at bar. *See* Reply Brief of Toshiba Corp. and Toshiba America Information Systems, Inc. at 1–3. If Toshiba wished to clarify the status of certain products, then it should have requested a scope ruling from Commerce during the period prior to the final LTFV determination pursuant to the following wisdom previously enunciated by this court:

Plaintiff clearly could have raised the issue before Commerce during the investigation and Commerce could have examined the ob-

jection to the scope of the investigation at that time. Instead, plaintiff slept on its rights. It did not raise the question until the matter reached the Commission [ITC]. Laches would prevent plaintiff from raising the issue after the final determination by Commerce. *Kokusai,* 10 CIT at 171, 632 F.Supp. at 27–28.

**12.** ITC noted that market share comparisons are complicated because sales in the subassemblies market are made at different levels of trade. As noted earlier, most domestic products are sold at the end user level and, therefore, are reported at end user prices. Imports are sold at the interconnect and wholesale level, thereby necessitating that the data for imports are reported at wholesale prices. ITC did find that, in value terms, the market penetration of cumulated imports increased slightly before dropping in 1988. Final Staff Rep. at A–115, Table 30.

**13.** ITC stated that figures for control and switching equipment provided the best indicator of import market penetration in the important new systems market segment. Japanese Final Det. at 45–46. Data on telephones was stated to represent the best indicator of the impact of imports in the overall SBTS market. *Id.*

nized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7).")". Although, where volume is small, absolute volume alone may not guide ITC's analysis under § 1677(7), *see id.* at 84–85, 655 F.Supp. at 490, the significance of the quantity of imports here is apparent from the record. There is no real need to focus on *increases* in import volume or market penetration where market penetration in quantity terms is approximately fifty percent and shows no sign of substantial decline. In this case substantial absolute volume and market penetration are vital and provide the backdrop for evaluation of all other factors.

### 2. Price Effects of Imports

ITC's summary of its own findings reads: "Our determinations are based, *inter alia,* primarily on the poor financial condition of the domestic industry that is the result, at least in part, of the significant volume and market share of cumulated LTFV imports and their depressing and suppressing effect on domestic prices and profits." Japanese Final Det. at 3. As indicated in the previous sections, the court sees little to argue about in the areas of the domestic industry's condition and import volume and market share.

The heart of the dispute before the court is ITC's price effects finding. Price effects were analyzed by ITC basically in terms of price depression, and ITC's finding with regard to underselling was part of its price

depression analysis. ITC concluded that there was evidence of price depression based on various factors, including the following: One, ITC noted various data indicating the decline of prices for small systems. Japanese Final Det. at 53. Two, ITC found that interconnects, especially in the smaller station market, were highly likely to "pass through" a significant amount of any cost savings to the customer. *Id.* at 48. Three, ITC found that significant price competition between the domestic like product and the subject imports existed. *Id.* at 52. Four, ITC observed that the data indicate that the prices of the imports were well below any price, which might include a premium,[14] that AT & T could command. *Id.* at 53. Five, the depressing effect of LTFV imports on domestic price was found to be corroborated by both lost sales data (including data on underselling)[15] and other data which indicated that the purchasing decision was price sensitive. *Id.*

### a. The Problems with the Price Constructs

Plaintiffs challenge ITC's finding on the basis that it is based entirely on defective price data. *See* Japanese Brief at 37–51, Korean Brief at 40–52. ITC recognized, however, that the price comparisons between the LTFV imports and the domestically produced subassemblies were problematic. *See* Japanese Final Det. at 39, 47, 51–53. Because the great bulk of imports did not directly compete with domestic products at the same level of trade,

**14.** ITC had concluded earlier that it would expect that "AT & T generally could command a premium for its product as the natural result of the familiarity of its name, its service reputation, and its advertising efforts." Japanese Final Det. at 50. Plaintiffs argue that this finding evidences that imported and domestically produced SBTSs were poor substitutes for each other and, therefore, the prices of imports did not significantly impact domestic prices. *See* Japanese Brief at 72–76. ITC refuted this contention by concluding that the existence of a price premium did not mean that there was an absence of competition between the two products. The premium price was found to be "the equilibrium price at which most purchasers would be relatively indifferent in choosing the premium product over the generic product." Japanese Final Det. at 50. The existence of such

premium means that the competing product must undersell the premium product by a larger margin in order to successfully increase its market share.

**15.** Lost sales data consisted of anecdotal information *concerning why purchasers decided to* buy an imported SBTS. ITC noted that the lost sales data "confirms instances of underselling well in excess of any possible price premium for AT & T." Japanese Final Det. at 53. As indicated, ITC used this data to bolster its price depression conclusion. *See id.* Both commissioners and the court have not always been satisfied that anecdotal lost sales data is highly probative, but neither has it been rejected outright, particularly if it is used corroboratively.

ITC attempted to arrive at useful proxy, or constructive, prices. To this end, ITC issued questionnaires to the parties, requesting prices for actual retail sales of installed systems to end users, even though installation is not the subject of the product investigation. Interconnects were asked to calculate a price for a certain base subassembly model for the same periods based on their actual purchase prices.[16]

The nature of the product at issue created very great price comparison difficulties. First, even at the interconnect level the subassembly models were not uniform; features and capacities for expansion differed. Second, questionnaire respondents could not always answer in terms of the base model and sometimes gave answers with regard to models deemed as close as possible to the base model. Third, some answers, particularly those obtained from sellers to end users, included data outside of the definition of the product under investigation. Fourth, the domestic end user prices clearly included factors outside the scope of the investigation such as installation, service, maintenance charges or various options for which ITC made no adjustments.

There appears to be no dispute that the serious problems in comparing products occurred as a result of inherent product features and sales configurations. But there is also no real question that ITC must assess causation even in the face of such difficulties. Difficulties with, or even impossibility of, direct price comparison do not mandate a negative determination.

■ In this case, ITC concluded that the substantial volume of LTFV imports had "a depressing or suppressing effect on domestic prices." Japanese Final Det. at 61. Although ITC noted in regard to underselling that "the data of record indicate that the prices of subject imports were well below any price premium that AT & T could command," *id.* at 53, ITC only reaches this conclusion after observing that the price comparisons obtained from questionnaire responses were problematic.[17] ITC appears to have based its *underselling* finding essentially on end user surveys rather than the faulty questionnaire data. *Id.* at A–83.[18] Moreover, ITC's conclusions concerning underselling are used only as partial support for the finding of price *depression* in the domestic market.

### b. Price Depression

Given the problematic questionnaire data, the question arises as to the basis for a price depression finding. As indicated, the price depression analysis begins with an inquiry as to whether prices declined during the period LTFV imports were present in the marketplace. Based on the information contained in the record, there is little doubt that ITC could have reasonably concluded that prices declined during the period of investigation. In addition to the testimony of one importer acknowledging that prices had been driven down,[19] ITC had at its disposal several published reports by independent industry analysts indicating that prices declined during the period.[20]

Moreover, it was permissible for ITC to rely on the problematic questionnaire response pricing data to *confirm* decline indicated by other data. The use of such pric-

---

**16.** It was necessary for the interconnects to calculate this price because they do not receive entire systems from the importers. Rather, they purchase subassemblies and configure systems for an individual customer or for resale. At the interconnect level of sale, there are no actual transactions which could be used to report prices of systems. ITC provided worksheets to the interconnects to ensure the requisite uniformity of the price calculations.

**17.** ITC was so aware of its questionnaire data problem that it did not use it to make specific price comparisons or calculate margins of underselling. Final Staff Rep. at A–134.

**18.** Contrary to the citation provided in the determination, ITC's footnote 145 apparently refers to page A–137 of the Final Staff Report, not page A–137 of the determination itself.

**19.** See Hearing Transcript, L1 Doc. 480 at 302 (witness states that prices had been driven down in "our collective zeal to get market share").

**20.** See AT & T's Prehearing Brief, L2 Doc. 50 at 54 (citing data published by Northern Business Information and the Eastern Management Group).

ing data as evidence of overall trends does not pose the same problems as does the use of the data to make point-to-point price comparisons. It appears that the data was used as a trend indicator. In examining the pricing data contained in Tables 34 and 36 of the Final Staff Report, ITC could have reasonably taken notice of the facially-apparent fact that the prices of SBTSs, especially those for the two smallest configurations, declined throughout the period. The data based on interconnect responses particularly, may be given some weight because it does not include non-subject merchandise, although problems of model variance do exist in that data as well. Nonetheless, as an indicator and confirmation of declining prices the data was not completely irrelevant. Had such data been unsupported by other significant data it probably should have been discarded, but, as indicated, price decline was supported by other evidence.

The court also notes that although it is ITC's burden to create an acceptable plan for investigation, plaintiffs are not in a strong position to argue that ITC's investigation was inadequate. Some of the plaintiffs concede that it was not possible for ITC to do a significantly better price analysis of the products at issue. ITC did not ignore plaintiffs' suggestions concerning

feasible and useful ways of gathering the pricing data through the questionnaires issued to the producers.[21] Rather, ITC adopted most of plaintiffs' suggestions.

ITC recognized that to reach a positive causation conclusion based on price depression, not only must there be downward price trends in prices to the interconnects, but the interconnects must be shown to "pass through" such product (equipment) cost savings to the end users, end use being the point of competition in the domestic market. Japanese Final Det. at 48. Given that almost fifty percent of the total installed price of a system may be attributed to the cost of the equipment, *see* Final Staff Rep. at A–62, Table 13, and after observing the competitive nature of the new systems sales market, ITC could reasonably have determined, as it did, that it was highly likely[22] that interconnects passed through savings in equipment costs to their retail customers. *See* Japanese Final Det. at 48. Furthermore, ITC noted that its conclusion was also supported by the Frank Lynn & Associates survey of interconnect pricing practices. *Id.* at 48–49 n. 134. The survey had reached the conclusion that the lowering of wholesale prices was the primary cause of the corresponding drop in retail prices. Statement by John Henderson, Vice–President, Frank

**21.** Plaintiffs argue that ITC's questionnaire would have produced comparable data had ITC requested the costs rather than the prices of system constructs because price figures incorrectly included everything sold with the system. *See* Korean Brief at 48–51, Joint Reply Brief Submitted By Goldstar Telecommunication Co., Ltd., Executone Information Systems, Inc., and Inter–Tel, Inc. at 23–25. Actual prices, of course, are key to a dumping investigation. ITC did attempt to obtain comparable prices for installed systems at the end user level by asking detailed questions on installation costs. The court also notes that during the course of this exhaustive investigation, ITC met with and evaluated the various parties' requests regarding the pricing data section of the questionnaire and, when feasible, attempted to incorporate most of the suggestions. *See e.g.,* Final Staff Rep. at A–133 n. 151 (ITC notes that it modified the questionnaire to request companies to provide the installed price for the first six sales in each period. This modification was requested in a letter to ITC outlining one importer's comments concerning the pricing section of the producer

questionnaire. *See* Letter to Elizabeth Henning from Akin, Gump, Strauss, Hauer & Feld dated July 27, 1989, L2 Doc. 100G at 3.) Examination of the initial suggestions and the final questionnaire indicates that, for the most part, plaintiff Executone's comments concerning how to obtain accurate installation costs were incorporated into section V–B of the questionnaire. *Compare* Letter to Rebecca Woodings from Hunton & Williams dated July 19, 1989, L2 Doc. 100F at 7 *with* Producer's Questionnaire, L1 Doc. 277 at 53 and 20. Plaintiffs complaints as to ITC's methodology are not very moving given that most of their suggestions were adopted by ITC.

**22.** Plaintiffs place significance in the use of the phrase "highly likely," arguing that ITC did not make a conclusion as to the actual existence of a pass through. *See* Japanese Brief at 57–59. No "beyond a reasonable doubt" standard applies. One would presume that a simple "likely" would suffice. In any case, the text following "highly likely" leaves little doubt that ITC concluded pass through occurred. *See* Japanese Final Det. at 48–49.

Lynn & Associates, L2 Doc. 50, Vol. II at 6.[23]

Plaintiffs contend, however, that for a pass through to have been found properly, ITC would have had to analyze actual demand elasticities and determine that the demand for imported SBTSs was price-elastic.[24] Japanese Brief at 64–65. It is sufficient that ITC, after conducting a lengthy and exhaustive investigation into the SBTS market through both primary investigation and use of secondary materials, found that pass through of price savings occurred without expressly relying on elasticity analysis. Other evidence will suffice. In short, given that ITC is responsible for weighing the evidence and determining its probative value, *see e.g., Metallverken Nederland B.V. v. United States,* 13 C.I.T. ——, ——, 728 F.Supp. 730, 746 (1989), ITC could have found the SBTS market to be competitive and concluded that a pass through did exist. Elasticity analysis, for purposes of ITC determinations, is still developing and is not required in every case. Furthermore, in this case there were varying views as to what the elasticities were and what roles they play. *See* Dissenting Views of Chairman Anne E. Brunsdale, Japanese Final Det. at 110 *et seq.*[25]

As the last step in connecting evidence on declining prices to a finding of price depression caused by LTFV imports, ITC found that the domestic product competes with the imported product at the end user level. ITC indicated its decision on this issue by stating "we believe that there has been significant price competition between the domestic like product and the subject imports." Japanese Final Det. at 52.[26] Record evidence substantially supports this finding. First, ITC had observed that, in a general sense, all producers offered most of the same features and there was no general product differentiation. *Id.* at 47, n. 131.[27] Decisions as to the comparability of products are very fact specific. There is much evidence in both directions on this issue so that the fact-finder has great latitude in making this particular finding. ITC also stated that "[W]e do not believe that quality differences are such that AT & T's product and the product of other producers, both foreign and domestic, are not acceptable substitutes for one another ..." *Id.* at 50–51. For a discussion of how the finding of substitutability may be squared with AT & T's alleged premium price, see *supra* n. 14 and corresponding text. Second, ITC noted that customer loyalty fu-

23. Plaintiffs criticize the survey because it did not address the reasons behind the declines in wholesale equipment costs. *See* Japanese Brief at 63–64. The survey, however, was offered as proof that price declines were passed along to the end user.

24. According to Chairman Brunsdale "The aggregate elasticity of demand is defined as the percentage decline in the total purchases of a good, both domestic and imported, resulting from a 1 percent increase in the price of each producer's product. By examining the elasticity of demand we gain insight into the degree to which the increase in the demand for imports resulting from the low, 'dumped' price is the consequence of an increase in the total demand for the product rather than reduced sales by the domestic producers." *See* Dissenting Views of Chairman Anne E. Brunsdale, Japanese Final Det. at 114 n. 28. *See also Alberta Port Producers' Marketing Board v. United States,* 12 CIT ——, ——, 683 F.Supp. 1398, 1400 (1988). A high elasticity of demand, *ceteris paribus,* would indicate that the increase in imports was due more to new sales than sales captured from the domestic producers.

Respondents argue that elasticity analysis is vital to a pass through determination. The court wonders what level and type of elasticity respondents would argue demonstrates no "pass through." The chairman does not answer this question and the other commissioners do not use elasticity analysis at all.

25. The court also notes that Chairman Brunsdale, after examining the conflicting data, found causation a "close" case. Japanese Final Det. at 134. Elasticity analysis provides no simple, clean-cut solution here.

26. In its investigation the ITC staff contacted various end users directly and questioned them about why they purchased their chosen SBTS. In each case, the end user reported that it had considered different SBTSs in reaching its final decision. *See* Final Staff Rep. at A–145–49. The end users' responses indicate that the various SBTSs were substitutable at the baseline level. Lost sales data corroborated the price competition finding, as well as the overall price depression finding. *See also supra* at 1508.

27. *See* Final Staff Rep. at A–137 (indicating that while options varied, standard features did not).

eled price competition because there was an incentive to cut prices in the beginning in the hope that the initial losses would be recouped in the future. *Id.* at 41. That is, once a customer bought the basic system, any later purchases would need to be compatible with the system and more likely would be from the same producer. Third, ITC observed the strong competition in the dominant submarkets. *See id.* at 39, 52.

Thus, the record supports the conclusion that prices declined, that equipment savings were passed through to the consumer end user, that the foreign product was price competitive with the domestic product, and that price depression due to LTFV imports was present.[28]

## Conclusion

The court has no doubt that the state of the domestic industry was attributable largely to its own multiple cost layering, but this does not mean that LTFV imports did not cause material injury. To borrow a principle from tort law, importers take the domestic industry as they find it. The industry was materially injured and ITC's determination that that injury was caused in significant part by LTFV imports was supported by the record evidence on volume, market penetration and price depression. One might also ask, will this record support the opposite conclusion? Although this is not the standard of review, it is often a good check to determine if further review by the court is necessary. In this case the negative determinations raise greater questions than do the affirmative ones, both legally and factually. As the basic methodology of the affirmative determination is really not at issue and there is ample support for the factual determinations contained therein, they must be sustained. Furthermore, the defective questionnaire pricing data was used in the limited way that was appropriate and its use does not detract significantly from the substantial support for the affirmative finding. Accordingly, plaintiffs' motion for judg-

ment on the agency record is denied and the action is dismissed.

---

28. Several other issues were raised, at least in passing, by the parties, such as the role of Centrex services in the industry and whether ITC properly investigated aftermarket sales. These matters and any others not specifically mentioned have been found not to warrant discussion.