**MAKITA CORPORATION, Makita U.S.A., Inc., and Makita Corporation of America, Plaintiffs,**

v.

**UNITED STATES of America, and United States Department of Commerce (International Trade Administration), Defendants,**

and

**Black & Decker (U.S.) Inc., Intervenor–Defendant.**

**MAKITA CORPORATION, Makita U.S.A., Inc., and Makita Corporation of America, Plaintiffs,**

v.

**UNITED STATES of America, and United States International Trade Commission, Defendants,**

and

**Black & Decker (U.S.) Inc., Intervenor–Defendant.**

**Slip Op. 97–92.**
**Court Nos. 93–08–00450, 93–08–00451.**

United States Court of International Trade.

July 8, 1997.

Verner, Liipfert, Bernhard, McPherson and Hand (William A. Zeitler, Douglas W. Hall, Steven R. Johnson), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division,

U.S. Department of Justice (Jeffrey J. Bernstein); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Linda A. Andros), Washington, DC, of counsel, for defendants United States and U.S. Department of Commerce.

Office of the General Counsel, U.S. International Trade Commission (Lyn M. Schlitt, James A. Toupin, Robin L. Turner), Washington, DC, for defendant U.S. International Trade Commission.

Stroock & Stroock & Lavan (James Taylor, Jr., Will E. Leonard, Washington, DC, and Alexei J. Cowett, New York City), for intervenor-defendant.

## OPINION & ORDER

AQUILINO, Judge.

In these actions, the plaintiffs have interposed motions for judgments on the records compiled by the International Trade Administration, U.S. Department of Commerce ("ITC") *sub nom. Final Determinations of Sales at Less Than Fair Value: Professional Electric Cutting Tools and Professional Electric Sanding/Grinding Tools from Japan,* 58 Fed.Reg. 30,144 (May 26, 1993), as amended, *Antidumping Duty Order and Amended Final Determination: Professional Electric Cutting Tools from Japan,* 58 Fed.Reg. 37,461 (July 12, 1993), and by the U.S. International Trade Commission ("ITC") *sub nom. Professional Electric Cutting and Sanding/Grinding Tools from Japan,* 58 Fed.Reg. 37,967 (July 14, 1993).

Jurisdiction of the court is pursuant to 28 U.S.C. § 1581(c). Its standard for review of the contested agency determinations is whether they are unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

### I

In its antidumping-duty petition filed with the ITA and ITC, Black & Decker (U.S.) Inc. alleged the subject to be professional electric cutting tools and sanding/grinding tools:

Professional electric cutting tools have blades or other cutting devices used for cutting wood, metal, and other materials. [They] include chop saws, cut-off saws, cordless saws, circular saws, worm drive saws, hypoid saws, jig saws, reciprocating saws, miter saws, planers, routers, jointers, angle cutters, shears, nibblers, and similar cutting tools. Professional electric sanding/grinding tools have moving abrasive surfaces used primarily for grinding, scraping, clearing, deburring, and polishing wood, metal, and other materials.... These tools are electromechanical tools and have self-contained electric motors. Some of these tools have electric cords; others are battery powered and are cordless. They are used by tradesmen, such as carpenters and electricians, for residential and non-residential construction and by industrial workers for a variety of industrial uses.

Professional electric power tools are typically designated, advertised, and sold as being suitable for "professional", "heavy-duty", or "industrial" use to distinguish such tools from "home" or "consumer" use electric power tools. [They] are distinguished by the producers and purchasers from consumer tools by their durability and ability to handle heavier work loads. Imported and domestically produced professional electric power tools typically, but not necessarily, are advertised as meeting the minimum safety standards promulgated by the Occupational Safety and Health Administration. Finally, professional electric power tools are sold at prices substantially higher than consumer electric power tools.

Petitioner believes that all of the exports to the United States by Makita Corporation ... Hitachi Ltd. ... and Ryobi Ltd. ... are professional electric power tools.... [1]

The ITA's notice of initiation of an investigation of the petition's allegations called upon the interested parties "to more accu-

---

1. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Administrative Record [hereinafter cited as "ITA Memorandum"], Appendix 1 at 3–4.

rately describe"[2] the tools at issue. Whereupon the petitioner suggested seven physical characteristics to distinguish consumer tools from those for professionals, to wit:

(1) The predominate use of sleeve or plain bearings.

(2) Spur or straight bevel gearing.

(3) Thermo plastic jacketed power supply cord with a length less than 8 feet.

(4) Power supply cord restrained by molded-on cord protector.

(5) The absence of user serviceable motor brushes.

(6) The predominate use of non-heat treated transmission parts.

(7) One coil per slot armature construction.

Plaintiffs' ITA Appendix 2, pp. 5–6. While the agency's preliminary determinations relied on these characteristics to the extent that tools possessed of at least five of the seven (or four of six) were considered to be for consumers and thus not subject to the investigation, the parties were invited therein to propose "criteria defining 'corded' professional power tools ... and additional criteria that should be considered in distinguishing professional and consumer tools." 58 Fed. Reg. 81, 82 (Jan. 4, 1993).

The above-cited final determinations of the ITA were that

professional electric cutting tools (PECTs) and professional electric sanding/grinding tools ... from Japan are being, or are likely to be, sold in the United States at less than fair value, as provided in ... 19 U.S.C. 1673d[].

58 Fed.Reg. at 30,144. Weighted-average dumping margins were reported to be 54.43 and 46.75 percent for Makita tools within the two covered categories. See id. at 30,151.

Upon referral of these determinations to the ITC, the commissioners concluded that an industry in the United States is materially injured by reason of imports from Japan of professional electric cutting tools but not sanding/grinding tools. See 58 Fed.Reg. 37,-967. This resulted in publication of the antidumping-duty order solely as to the cutting tools, with the amended estimated margin set at 54.52 percent. See 58 Fed.Reg. 37,461.

These actions ensued, with the plaintiffs Makita contesting the affirmative determinations of both agencies.

## II

The motion which the plaintiffs direct at the ITA pursuant to CIT Rule 56.2 has four major points of contention, namely, (a) the definition of "professional" electric cutting tools is not based on substantial evidence; (b) the investigation of U.S. sales of used and reconditioned tools was neither supported by substantial evidence nor otherwise in accordance with law; (c) the "pooling" of home-market products is not authorized by law; and (d) the agency erred in its adjustments to foreign-market value and U.S. price.

## A

■ The plaintiffs argue that the "difficulty ... in defining the so-called 'professional' tools ... clearly shows that the definition which the Department ultimately came up with was arbitrary". Plaintiffs' Brief [ITA], p. 21. That definition is as follows:

"Corded" and "Cordless" PECTs are included within the scope of this order. "Corded" PECTs, which are driven by electric current passed through a power cord, are, for purposes of this order, defined as power tools which have at least five of the following seven characteristics:

(1) The predominate use of ball, needle, or roller bearings (i.e., a majority or greater number of the bearings in the tool are ball, needle, or roller bearings);

(2) Helical, spiral bevel, or worm gearing;

(3) Rubber (or some equivalent material which meets UL's specifications S or SJ) jacketed power supply cord with a length of 8 feet or more;

(4) Power supply cord with a separate cord protector;

(5) Externally accessible motor brushes;

**2.** 57 Fed.Reg. 28,483 (June 25, 1992).

(6) The predominate use of heat treated transmission parts (i.e., a majority or greater number of the transmission parts in the tool are heat treated); and

(7) The presence of more than one coil per slot armature.

If only six of the above seven characteristics are applicable to a particular "corded" tool, then that tool must have at least four of the six characteristics to be considered a "corded" PECT.[3]

"Cordless" PECTs, for the purposes of this order, consist of those cordless electric power tools having a voltage greater than 7.2 volts and a battery recharge time of one hour or less.

58 Fed.Reg. at 37,462. *See also* 58 Fed.Reg. at 30,145. On its face, this reflects extrapolation of the petitioner's "consumer" criteria, *supra.* *Cf.* Plaintiffs' ITA Appendix 8.

Be that as it may, upon review of the record developed before the agency, this court cannot concur that this definition is "arbitrary", as alleged. On the contrary, there is substantial evidence, as defined by the courts[4], on the record in support of differentiating professional from consumer electric cutting tools. It includes, for example, representations to the effect that the

professional power tool is designed to be more powerful, to last longer and to perform better under stressful conditions than its consumer counterpart. The difference is one of function and design. Both do the jobs they were designed to do extremely well. But, they are designed for totally different applications.

Brief of Defendant–Intervenor [ITA], Appendix 5, p. 1. This statement also indicates that professional models have longer cords, which are made of more durable materials that

remain flexible in cold weather and are also removable, have more durable switches, utilize more powerful motors, and contain ball bearings rather than less-costly and lower-quality sleeves. *See id.* at 2–8, 13–14. Testimony of another engineer in the record shows that Black & Decker had two production lines at a plant, one devoted to manufacturing consumer power tools and the other to those for professionals. *See* ITA Memorandum, Appendix 7, p. 69 and record document ("R.Doc.") 54. That engineer also explained the method by which the company settled on the factors to distinguish professional from consumer tools. *See* ITA Memorandum, Appendix 7, pp. 70–73.

Catalogues submitted by Black & Decker, Hitachi Power Tools U.S.A. Ltd. and Makita all differentiate electric cutting tools, with some characterized as heavy-duty and suited for professionals and others as lighter-duty for use at home. A Black & Decker catalogue claims "a big difference" between them, stating that professional tools

are used by tradesmen such as carpenters or electricians or by serious do-it-yourselfers who need rugged products that can stand up to day-in, day-out continuous use. These heavy duty [p]rofessional tools and accessories work all day, often under adverse conditions such as extreme cold or around dirt and dust. So they are designed to be more powerful, to handle heavy work loads, to sustain overloading and overheating for longer periods of time, to last longer and to perform better under stressful conditions.[5]

In Makita's catalogue, three levels of cordless power tool are discussed, with only two of the three models seemingly suitable for professionals. *See* ITA R.Doc 1, Exhibit II

---

**3.** For improved understanding, this sentence is being quoted separately from characteristic (7), with which it is printed in the original.

**4.** *See, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Matsushita Electric Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984); *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

**5.** ITA R.Doc 1, Exhibit II C–2, p. 1. A 1991 report published by the Caney Research Group, for example, surveyed contractors whether they planned to purchase consumer-quality power tools for their work. ITA Memorandum, Appendix 6, Attachment F. Eighty-seven percent replied that they would not use such tools in place of professional models. *See id.* Further:
> ... No building contractor would work without a circular saw, usually a heavy-duty "professional" model priced at $150 or more.

*Id.,* Attachment D.

A, pp. 5–6. Similarly, Hitachi refers to three levels of circular saws: medium, heavy and super duty. *See id.* at 35–36.

Other literature in the record differentiates between "professional" and "consumer" tools One article, for example, cites some twelve to 14 physical characteristics of "professional" corded tools. *See* Plaintiffs' Brief [ITA], Appendix 10, Exhibit II C–1 (*Power Tools, What's the Difference Between Consumer and Professional,* Wood Magazine, Nov. 1991, at 58). *See also* ITA Memorandum, Appendix 6, Attachment [B] (*Commercial Versus Consumer Models,* Better Homes & Gardens: Wood, Oct. 1990, at 42–43 ("consumer" cordless power tools do not need the power and precision required of "professional" models)).

The plaintiffs dispute the ITA's choice of power and durability as the best defining characteristics since "there is no evidence in the record showing that the Department's seven characteristics for corded electric cutting 'professional' tools fully and accurately capture 'power' and 'durability' in tools." Plaintiffs' Brief [ITA], p. 26. They also contend that

> there is no justification for the Department's selective choice of only *certain* characteristics it believes are associated with "power" and "durability".... Logic requires that *all* characteristics which impart power and durability be included in any definition based on these qualities.

*Id.* at 25 (emphasis in original). In addition, the plaintiffs claim that the evidence relied upon by the ITA shows "no uniformity in what characteristics define a 'professional' tool". *Id.* at 28–29. Contending that the agency's seven factors for corded tools and two for cordless models are arbitrary and illogical, the plaintiffs take the position that neither wholesalers, purchasers, the Harmonized Tariff Schedule of the United States, nor industry or marketing standards use the ITA's definition of "professional" tools.

The agency's response has been as follows:

... Having determined that physical characteristics which impart power and durability would be the most useful for clarifying scope, we first examined petitioner's criteria and found that each related to the motor, overall construction, and power supply—the primary factors which affect the power and durability of the tool. Thus, we concluded that these factors were reliable indicators of the power and durability of a tool. Next, we compared petitioner's characteristics to the physical characteristics of tools imported into the United States and determined that these characteristics offered a practical and consistent means of distinguishing between professional and consumer tools....

*Id.,* Appendix 8, p. 4. Indeed, interested parties refer to criteria of the kind accepted by the ITA to distinguish "professional" from "consumer" tools. A letter by Ryobi counsel indicates motors, gears, switches, electrical cords and housings differentiate "professional" and "consumer" tools in that company's view. *See* ITA Memorandum, Appendix 9, pp. 34–35. These five factors match those first proposed in the petition herein. *See* Brief of Defendant–Intervenor [ITA], Appendix 3, pp. 7–8. Hitachi apparently perceives a distinction between "professional" and "consumer" tools but believes that durability is impossible to characterize objectively. *See id.,* Appendix 7, p. 2. It subsequently suggested that capacity and power input should be used as defining characteristics. *See id.* at 3. Hitachi also suggested breaking the tools down into even smaller classes, with circular saws and jig saws, for example, each constituting a separate class. *See id.* SB Power Tool Co. made two suggestions to change slightly the seven criteria proposed by Black & Decker. *See id.* And the ITA subsequently adopted one of them. *See id.* at 4. As for the plaintiffs, a statement by the president of Makita U.S.A. Inc. acknowledges that "certain hand held tools are sold to and are for the single use of professionals, where purchase and use by consumers is [*sic*] only inconsequential."[6] And they suggested that three criteria, namely, capacity,

---

6. ITA R.Doc 85, Exhibit C, p. 1. But the plaintiffs did submit to the ITA 552 form statements which claimed no distinction between "professional" and "consumer" tools.

weight and type, determine whether tools are for use by professionals. *See id.* at 1–2.

The record reflects that the ITA reasonably considered such comments of the interested parties. Concluding that the characteristics proposed by the petitioner provided "a practical and consistent means of distinguishing between professional and consumer tools", the agency did not adopt the approach advocated by Makita. *See id.* at 4. Although the evidence on the record may not provide a clear consensus on the definition of "professional" tool, it does not negate the ITA's position. The agency examined it, took the parties' comments thereon into account, and reached a supportable determination:

> There should be little doubt by now that the scope of an investigation and subsequent determination pursuant to the Trade Agreements Act of 1979, as amended, lies largely in the ITA's discretion. *E.g., Mitsubishi Electric Corp. v. United States,* 898 F.2d 1577, 1583 (Fed.Cir.1990). And the agency generally exercises this "broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition." *Minebea Co. v. United States,* 16 CIT 20, 22, 782 F.Supp. 117, 120 (1992), *aff'd on other grounds,* 984 F.2d 1178 (Fed.Cir. 1993).

*Kern-Liebers USA, Inc. v. United States,* 19 CIT ——, ——, 881 F.Supp. 618, 621 (1995). *Cf. INA Walzlager Schaeffler KG v. United States,* 108 F.3d 301 (Fed.Cir.1997).

### B

■ In reporting that its antidumping-duty order covers "all hand-held PECTs and certain bench-top, hand-operated PECTs", the ITA refers, among other things, to headings 8461 and 8465 of the Harmonized Tariff Schedule of the United States. 58 Fed.Reg. at 37,461. Certain subheadings of the former, in particular 8461.50.00.10, encompass "Used or rebuilt" cutting tools. The plaintiffs state that such tools are carefully inspected and

> reconditioned by [them] in the United States and are subsequently sold as reconditioned (i.e., remanufactured) merchandise [,]

but that the agency erred in including them within the scope of its determination. Plaintiffs' Brief [ITA], p. 60. They argue that the petition focused only on imported, new PECTs and did not even cite subheading 8461.50.00.10 (in contrast with other sections of the HTSUS actually enumerated therein); that other federal agencies consider new and used goods to constitute separate classes of merchandise; and that inclusion of their "remanufactured" goods was unfair in that it inflated the overall dumping margin(s).

None of these arguments counsels relief. This and other courts have held that a petitioner is not required to circumscribe the entire universe of articles which might possibly be covered [7] by the order it seeks. *Nitta Industries Corp. v. United States,* 16 CIT 244, 248 (1992) citing *American NTN Bearing Mfg. Corp. v. United States,* 14 CIT 320, 327–28, 739 F.Supp. 1555, 1562 (1990), *aff'd,* 997 F.2d 1459 (Fed.Cir.1993). Indeed, the responsibility for such definition lies with the ITA, not the domestic petitioner. *See, e.g., Mitsubishi Electric Corp. v. United States,* 898 F.2d 1577, 1582 (Fed.Cir.1990). And the agency has discretion in carrying out that responsibility to look to the U.S. tariff schedules or not. In the matter at bar, for example, while referring to sections of the HTSUS in its final determination and resultant antidumping-duty order, the ITA specifically eschewed making them dispositive. *See* 58 Fed.Reg. at 30,145, 37,462. That those sections may be of moment to other agencies, such as the U.S. Customs Service or the Federal Trade Commission, or that they in the exercise of their particular lawful responsibilities may treat classes or kinds of merchandise differently, does not compel the Commerce Department to follow their approach(es) in its enforcement of the Trade Agreements Act of 1979, as amended. *See,*

---

7. The court notes in passing that petitioner Black & Decker denies any intent to exclude plaintiffs' remanufactured tools, contending that they compete with its own sales of such kind of goods, as well as of new ones: "Reconditioned tools are direct substitutes for new tools." Brief of Defendant–Intervenor [ITA], p. 55.

*e.g., Royal Business Machines, Inc. v. United States,* 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd,* 69 C.C.P.A. 61, 669 F.2d 692 (1982). Finally, if the definition of the scope of such enforcement is in accordance with that law, understandably all those goods within that ambit will influence the calculation of any dumping margin.

### C

■ At the time of the final determination at bar, that statute stated the foreign-market value of imported goods to be the price at which such or similar merchandise was sold in the usual commercial quantities and in the ordinary course of trade for home consumption. 19 U.S.C. § 1677b(a)(1)(A). And the determination reports that the ITA

> based all product comparisons in the U.S. and home markets on sales of similar merchandise ... because identical merchandise was not sold in the two markets. We selected similar merchandise by applying the following criteria in descending order of importance: (1) configuration; (2) corded vs. cordless; (3) capacity; (4) power (amps, volts, watts); (5) speed; (6) housing material; and (7) size. Where we found more than one home market model equally similar to a U.S. model in terms of these criteria, we treated these models as equally similar....

58 Fed.Reg. 30,145–46. It also reports objection to agency comparisons of Makita tools for the U.S. market with "pools" of home-market models sharing the seven product characteristics. *Id.* at 30,149 *(Comment 15 ).* The plaintiffs renew this objection now, arguing that such "pooling" is not authorized by the law. *See* Plaintiffs' Brief [ITA], pp. 64–71. Their proposal has been to select from each group the "unique model" which is "most similar" to the U.S. product. *Id.* at 66. They quote from *Timken Co. v. United States,* 10 CIT 86, 630 F.Supp. 1327 (1986), that while the

> statute does not make explicit whether, if two or more products fall within the definition of a given subsection of the statute, the ITA must determine which of those

products is *most* similar to merchandise sold in the United States. However, such a requirement is implicit in the statutory scheme. The arrangement of definitions in the statute is such that the requirement that the ITA choose merchandise within the first applicable definition amounts to a requirement that it choose the most similar merchandise—at least insofar as the broad statutory definitions of "such or similar merchandise" are concerned. The spirit if not the letter of this requirement obligates the agency to also ascertain what constitutes the most similar merchandise from within a given definition.

10 CIT at 96, 630 F.Supp. at 1337 (emphasis in original). Indeed, in *United Engineering & Forging v. United States,* 15 CIT 561, 567, 779 F.Supp. 1375, 1381 (1991), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993), this court had occasion to quote further from the foregoing *Timken* opinion, 10 CIT at 98, 630 F.Supp. at 1338, that

> [i]t is of particular importance that the administering agency itself make the required determination of what constitutes most similar merchandise ..., considering that the issue may be a complex one on which reasonable minds could differ. For example of two potentially "similar" foreign market products, one product could be most similar to merchandise sold in the United States in its use, while the other might be more similar in its materials. It is the administering agency rather than an interested party that should make the determination as to what "similar" characteristics are of the most significance. Additionally, it is hard to imagine that a foreign manufacturer, given the option of selecting what constitutes similar merchandise, and assuming that there exists more than one product from which a choice can be made, would not make the choice of merchandise most advantageous to itself.

Notwithstanding this and subsequent cases, scores of which have reviewed ITA comparisons of varying versions of roller bearings for home markets and for the United States [8], the plaintiffs claim "no prece-

---

**8.** *See, e.g., NSK Ltd. v. [United States],* 17 CIT 987 (1993); *NTN Bearing Corp. of America v. United*

dent" [9] supports the agency's approach herein. While the court can concur that few cases to date reflect pooling of home-market goods for purposes of comparison [10], it cannot agree that the ITA was without authority to do so. Subsequent to the filing of the briefs herein [11], the court of appeals in *Koyo Seiko Co. v. United States*, 66 F.3d 1204 (Fed.Cir. 1995), sustained the agency's comparison of the roller bearings at issue via five stated criteria without any limitation on the deviation of any one of them and then choosing as the best match the model for which the sum of the deviations was the lowest. *See* 66 F.3d at 1207. The court agreed that

> Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology necessary to yield "such or similar" merchandise under the statute. This Congressional delegation of authority empowers Commerce to choose the manner in which "such or similar" merchandise shall be selected.

*Id.* at 1209, citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442 (Fed.Cir. 1994); *Texas Crushed Stone Co. v. United States*, 35 F.3d 1535 (Fed.Cir.1994). Moreover, the final determination before this court reports that

> in only twenty percent of the [matches] was more than one home market model identified as equally similar. Within this grouping, only those models with a difmer

*States*, 17 CIT 1149, 835 F.Supp. 646 (1993); *NTN Bearing Corp. of America v. United States*, 18 CIT 629, 858 F.Supp. 215 (1994); *Koyo Seiko Co. v. United States*, 18 CIT 711, 861 F.Supp. 87 (1994); *SKF USA Inc. v. United States*, 19 CIT ——, 874 F.Supp. 1395 (1995); *Torrington Co. v. United States*, 19 CIT ——, 881 F.Supp. 622 (1995); *Federal–Mogul Corp. v. United States*, 20 CIT ——, 918 F.Supp. 386 (1996); *NSK Ltd. v. United States*, 20 CIT ——, 919 F.Supp. 442 (1996).

9. Plaintiffs' Reply Brief [ITA], p. 52.

10. The agency refers to its *Final Determinations of Sales at Less Than Fair Value: Sweaters from Korea*, 55 Fed.Reg. 32,659 (Aug. 10, 1990), and

of 20 percent or less have been used in the comparison.

58 Fed.Reg. at 30,150. The record substantiates this response by the ITA, which is also in accordance with law.

### D

The plaintiffs contend that the agency erred in calculating foreign-market value by disallowing adjustments for Makita blanket-order and quantity discounts and for delivery expenses incurred by salesmen. They also contest readjustment of the U.S. price for certain cash discounts.

### (1)

■ According to the final determination, the ITA denied a circumstances-of-sale adjustment for discounts for blanket orders by "dropship dealers" [12] on the ground that it

> examined this expense at verification and found that the effect of the discount is to reduce the amount paid to the wholesaler (the first unrelated customer) by the retailer but not the amount paid to Makita from the wholesaler. Consequently, Makita bears no cost as a result of this discount and this does not qualify as a reduction to FMV.

58 Fed.Reg. at 30,148 (*Comment 5*). Counsel now add that the

> fact that the wholesaler was paid less by the dealer was irrelevant in calculating FMV. Because Makita ... did not establish a direct relationship between the discounts and the relevant sales, Commerce properly disallowed the claimed adjustment.

*Final Determinations of Sales at Less Than Fair Value: Sweaters from Taiwan*, 55 Fed.Reg. 34,585 (Aug. 23, 1990), as precedent. *Cf. Federal–Mogul Corp. v. United States*, 20 CIT at ——, 918 F.Supp. at 400 ("Commerce's use of the family model match methodology ... is in accordance with law").

11. The court notes in passing that the papers submitted by all of the parties are of such quality as to obviate any need to burden them with oral argument, the formal motion for which is thus hereby denied.

12. Plaintiffs' ITA Appendix 25, pp. 12–13, para. 2.

ITA Memorandum, p. 48 (footnote omitted). They cite for support, *id.* at 47, *Smith–Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The plaintiffs do not deny that adjustments pursuant to the Trade Agreements Act of 1979, as amended, 19 U.S.C. § 1677b(a)(4) (1993), as interpreted by the foregoing case and others, "must have a reasonably direct relationship to the sales under consideration and that value determinations must be based on proof of actual costs not on estimates, approximations, or averages." 713 F.2d at 1580. Rather, they claim

> [a]ll documents establish that Makita *did* bear the cost of th[e blanket-order] discount, which is the only relevant fact that need be considered by the Department.

Plaintiffs' Reply Brief [ITA], p. 56 (emphasis in original, citing Plaintiffs' ITA Appendixes 25, pp. 12–13 and 26, Exhibits 19, 19A, 20). In other words, their claim is that the agency's denial of the adjustment is unsupported by substantial evidence on the record.

The court cannot concur. After examination of the confidential versions of all of the cited documents, the court cannot conclude that the contents prove plaintiffs' premise.

### (2)

■ In determining foreign-market value, the ITA reports that it disallowed adjustment for Makita's claimed quantity discounts due to "large positive values ... which we determined to be incorrect". 58 Fed.Reg. at 30,146. The record reflects that the company had been asked to amend the numbers which apparently arose from "key-punch errors". Defendants' ITA Appendix 11, p. 22. That home-market verification report, confidential document 53, indicates how even such entries, which apparently were not corrected [13], can and do skew ability to make accurate adjustment.

Nonetheless, the plaintiffs point to a sentence in the report that "[n]o discrepancies were noted regarding Makita's method for reporting this discount" [14] and argue that the

"drastic remedy of disallowance of the entire quantity discount is hardly justified, ... arbitrary and unreasonable." [15], given only the " 'key-punch type' problem." Plaintiffs' Reply Brief [ITA], p. 61, n. 77. It has been held, however, that the ITA is not obligated to accommodate errors of a respondent which fails to timely correct them. *E.g., RHP Bearings v. United States,* 19 CIT ——, ——, 875 F.Supp. 854, 856 (1995). That is, the burden of correct(ing) requested, necessary information remains upon its source throughout a proceeding such as this. *Cf. Yamaha Motor Co. v. United States,* 19 CIT ——, ——, 910 F.Supp. 679, 687 (1995); *Nachi–Fujikoshi Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1106, 1111 (1995); *NSK Ltd. v. United States,* 17 CIT 590, 592, 825 F.Supp. 315, 319 (1993). In the light of such cases, this court cannot and therefore does not conclude that the agency's disallowance of an adjustment for plaintiffs' quantity discount was not in accordance with law.

### (3)

■ The record indicates, and the ITA has found, that Makita salesmen themselves delivered some of the tools they sold to customers in the home market. Hence, the agency rejected the company's actual home-freight expenses, opting for best information otherwise available within the meaning of 19 U.S.C. § 1677e(c) (1993).

> ... However, the respondent's proposed method for calculating this expense contained many discrepancies and failed to accurately measure [it] .... The amount allowable to a commercial carrier is an independent indicator of what [it] would be. Therefore, as BIA for the salesmen's portion of inland freight, we used the commercial truck expense claimed by respondent.

58 Fed.Reg. at 30,147 (*Comment 2* ). The discrepancies related to calculation of salary amounts associated with transporting of the merchandise by salesmen, to wit: the number of deliveries claimed by some were incorrect; some deliveries claimed were unaccounted for; other deliveries were double

---

**13.** *Cf.* Plaintiffs' Reply Brief [ITA], pp. 60–62.

**14.** Plaintiffs' ITA Appendix 26, p. 23.

**15.** Plaintiffs' Reply Brief [ITA], p. 61.

counted; and the number of work hours in a day were overstated. *See* Defendant–Intervenor ITA Appendix 24, p. 5. Counsel now add that,

> [a]s a result, Commerce determined that the delivery time ratio reported by Makita was not corroborated by the information examined at verification.... At the same time, because Makita was able to establish at verification that sales branches often requested approval to hire commercial delivery services to free their salesmen from the delivery function, Commerce properly determined that the commercial carrier's expenses should be utilized as the best information available ... for this portion of the home market freight expense.

ITA Memorandum, p. 49 (citation omitted).

The plaintiffs respond that, "[g]iven the nature of the expense, only an estimate, not actual figures, could reasonably be used"[16] and that, in any event, the discrepancies discovered by the agency were but a "few minor"[17] ones. From their presumably-most-knowledgeable perspective, this may be true, but in-house understanding does not govern the ITA, its statute does, which required it to use best information available when, as herein, it was unable to verify the accuracy of the data submitted. *See* 19 U.S.C. § 1677e(b) (1993). *See also* 19 C.F.R. § 353.37(a) (1993).

The court finds the agency selection to have been in accordance with that law, in particular in light of the recorded fact that

> Makita sales branches do request approval from Makita's Anjo [Japan] office to hire commercial delivery services in order to free their salesmen from making deliveries.

Defendant-Intervenor ITA Appendix 24, p. 6.

(4)

■ The plaintiffs concede that, during attempted verification of U.S. price, the ITA detected a computational error on their part with regard to a line-item discount for freight, which had not been subtracted from

the gross unit price for some transactions. Whereupon the agency recalculated the cash discounts, albeit relying on Makita's methodology. *See* 58 Fed.Reg. at 30,149 (*Comment 13*). Nonetheless, the plaintiffs argue that the recalculation goes beyond a correction of error; it "is overly broad, and penalizes Makita out of proportion with the actual error found." Plaintiffs' Reply Brief [ITA], p. 63.

The court is not persuaded after review of the record that this is the case. That is, the recalculation only appears to affect the admittedly-erroneous entries. Furthermore, even if it encompassed all of the split sales in question, the plaintiffs fail to quantify any resultant, actual "penalty". Hence, their prayer for any relief from the ITA's recalculation of certain cash discounts "for selected sales at one [U.S.] branch office because an amount for freight allowance was not subtracted from the gross unit price"[18] must be denied.

III

As shown above, the plaintiffs also contest the contingent injury determination of the ITC. Its preliminary determination pursuant to 19 U.S.C. § 1673b(a) had been

> that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Japan of professional electric cutting and sanding/grinding tools, provided for in subheadings 8461.50.00, 8465.91.00, 8508.20.00, and 8508.80.00 of the Harmonized Tariff Schedule of the United States, that are alleged to be sold in the United States at less than fair value (LTFV).

*Professional Electric Cutting and Sanding/Grinding Tools From Japan,* USITC Pub. 2536, p. 3 (July 1992). Upon publication of the ITA's final determinations of sales of both kinds of professional tools at less than fair value, 58 Fed.Reg. 30,144 (May 26, 1993), the Commission concluded that an industry in the United States is materially injured by

---

**16.** *Id.* at 58.

**17.** *Id.* at 57, 58.

**18.** 58 Fed.Reg. at 30,149 (*Comment 13*).

reason of imports of cutting, but not sanding/grinding, tools from Japan.[19]

## A

While the published views of all six members of the ITC are in support of this determination, they perceive the "like product" contemplated by the governing statute, 19 U.S.C. § 1677(10) (1993)[20], differently. Chairman Newquist and Commissioners Rohr and Nuzum found that

the differences between professional and consumer electric tools in physical characteristics, uses, producer and customer perceptions, production processes, and limited interchangeability outweigh the similarities in terms of channels of distribution[21,]

whereas the analysis of such factors on the part of Vice–Chairman Watson and Commissioners Brunsdale and Crawford led them to "conclude that no clear dividing lines exist between professional and consumer electric cutting tools". Pub. 2658, p. 62.

## (1)

■ The plaintiffs take the position that the

Commission erred in failing to articulate a coherent, common, single majority position on the definition of the "like product" in the investigation. Not having been able to adequately define the "like product," [it] should have terminated the investigation with a negative determination.

**19.** *See Professional Electric Cutting and Sanding/Grinding Tools From Japan*, USITC Pub. 2658, p. 3 (July 1993) [hereinafter cited in short form "Pub. 2658"].

**20.** Subsection (4)(A) of this section 1677 defines "industry" to mean in general

the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product; . . . .

**21.** Pub. 2658, p. 18.

**22.** It has been held that "Commerce's designation of the class or kind of merchandise sold at LTFV does not control the Commission's definition of the industry injured in its sales of like products." *Hosiden Corp. v. Advanced Display Mfrs. of America*, 85 F.3d 1561, 1568 (Fed.Cir.

Complaint [ITC], para. 12. It has been held, however, that,

[a]lthough the Court and the domestic industries themselves would prefer that the Commission agree on the like product, there is no statutory requirement for each of the commissioners to agree on the same like-product definition.

*Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1210, 704 F.Supp. 1075, 1088 (1988). Indeed, the Trade Agreements Act has contemplated differing views among members of the Commission from the beginning. *See* Pub.L. No. 96–39, Title I, § 771(11), 93 Stat. 144, 179–80 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979). Hence, it has provided that, if

the Commissioners voting on a determination . . . are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination.

19 U.S.C. § 1677(11) (1993). Of course, this is not the circumstance presented at bar, which apparently is not directly addressed by either the statute or judicial precedent. Be this as it may, the court concludes that neither precludes affirmance of each definition of like product[22] given the long-standing judicial definition of substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"[23], combined with the rule that "the possibility of drawing two inconsistent

1996), relying on *Algoma Steel Corp. v. United States*, 12 CIT 518, 523, 688 F.Supp. 639, 644 (1988), *aff'd*, 865 F.2d 240 (Fed.Cir.), *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989); *Mitsubishi Electric Corp. v. United States*, 898 F.2d 1577, 1584 (Fed.Cir.1990); *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 634, 637 n. 4, 693 F.Supp. 1165, 1168 n. 4 (1988). Furthermore, neither industry-wide standards nor tariff provisions, as interpreted by the U.S. Customs Service, are necessarily controlling. *See, e.g., Roquette Freres v.. United States*, 7 CIT 88, 95, 583 F.Supp. 599, 605 (1984).

**23.** *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938); *Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1393 (Fed.Cir.1997); *Taiwan Int'l Standard Electronics, Ltd. v. United States*, 21 CIT ——, ——, 963 F.Supp. 1202, 1205 (1997).

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *Grupo Industrial Camesa v. United States,* 85 F.3d 1577, 1582 (Fed. Cir.1996); *Taiwan Int'l Standard Electronics, Ltd. v. United States,* 21 CIT ——, ——, 963 F.Supp. 1202, 1205 (1997). *But compare USX Corp. v. United States,* 12 CIT 205, 206 n. 2, 682 F.Supp. 60, 63 n. 2 (1988) ("If clear reasoning supporting a determination is lacking, . . . the determination may appear to be arbitrary if viewed in the context of contrary determinations based on seemingly similar facts").

■ As indicated above, in analyzing like product commissioners consider certain factors, essentially physical characteristics and uses, interchangeability, channels of distribution, producer and customer perceptions, circumstances of manufacture, and price. *See, e.g., Torrington Co. v. United States,* 14 CIT 648, 652, 747 F.Supp. 744, 749 (1990) *aff'd,* 938 F.2d 1278 (Fed.Cir.1991). And Congress did not intend such consideration to be so narrow

> as to permit minor differences in physical characteristics and uses to lead to the conclusion that the [domestic] product and [imported] article are not "like" each other, nor should the definition of "like product" be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration[,24]

or anticipate that every investigation would entail precisely the same methodological approach or priority to the foregoing factors. *See, e.g., Chung Ling Co. v. United States,* 16 CIT 636, 647, 805 F.Supp. 45, 54 (1992).

### (2)

The record at hand includes information developed by the ITC staff itself, as well as from producer, importer and purchaser questionnaires, pre- and post-hearing submissions by the parties, and testimony at the public hearing. Based thereon, the first group of commissioners, Chairman Newquist *et al.,* concluded that cutting tools for professionals are

> designed to withstand harsher treatment, perform under more extreme conditions, and operate more or less continuously. Thus, [they] are designed to be more durable than their consumer counterparts. To this end, professional tools are generally heavier in weight, housed in heavier-gauge steel or compound materials, powered by higher amperage and more overload-tolerant motors, have heavier and more wear-resistant bearings, and are fixed with a thicker-jacketed power cord of special rubber to resist abrasion and retain flexibility during cold weather. The professional/industrial tool is also assembled from different components than the consumer tool.

Pub. 2658, pp. 12–13 (footnotes omitted). The second group, as recited above, found a "continuum of cutting tools" and thus one like product which includes all of them. *Id.* at 51.

The plaintiffs claim that the latter group, Vice–Chairman Watson *et al.,* "took the correct approach", whereas that of the first "was arbitrary and unsupported by substantial evidence in the record." Plaintiffs' Brief [ITC], p. 20. Among other things, they argue that there is no industry basis for classifying electric cutting tools as professional due to physical characteristics, that there is no clear line dividing such tools for professionals as opposed to consumers, and that the physical characteristics relied on by the first group for corded and cordless tools are illogical and baseless.

Opposing counsel concede that the "Commission looks for clear dividing lines among products like and most similar to the subject imports"[25], but they also confirm that

> the Commission's role is to accept Commerce's scope determination and then to determine what domestic product is like the imported articles identified by Commerce.

---

**24.** S.Rep. No. 249, 96th Cong., 1st Sess. 90–91 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 476–77.

**25.** Defendant ITC Memorandum, p. 32.

Defendant ITC Memorandum, p. 30. In doing so, it is contended that Chairman Newquist and Commissioners Rohr and Nuzum "explicitly did not evaluate physical characteristics of professional and consumer electric cutting tools on the criteria established in Commerce's definition of the imported tools, a fact that Plaintiffs repeatedly ignore."[26]

The record supports this contention. It shows with regard to the physical characteristics recited by them and quoted above that they found, among other things, the motors of professional tools constructed in such a manner as to reduce heat and thereby extend operating life; the power transmission parts heat-treated for increased strength, durability and resistance to wear; the gearing and the bearings more durable than those in consumer tools; and the power cords on professional tools with rubber jackets and separate protectors. Hence, the record contains testimony to the effect that a professional circular saw is designed to perform 500 hours as compared with 150 for a consumer model. *See* ITC R.Doc 43, p. 21.

The view of the first group of commissioners is that the extent of actual differences "varies from one tool type to another"[27] but that, whatever the degree of interchangeability among them, it appears to be in the direction of professional tools. *See* Pub. 2658, pp. 14–15. They base this finding primarily on a report in the record by the Caney Research Group entitled *The 1991 Professional Power Tool Brand Image and Purchase Tracking Study* that, while 25 percent of the tradesmen had purchased tools arguably made for consumers, only nine percent of those surveyed would purchase such a tool again for a professional job.[28]

Chairman Newquist *et al.* conclude that the "distinction between professional and consumer tools is widely accepted in the industry." *Id.* at 15. They cite for support the staff report, *id.* at I–5, which concedes, however that "actual differences vary from

one tool type to another." While Makita denies the existence of such distinction, at least in regard to its own products, the first group of commissioners focuses on the fact that warranties and safety certifications generally differ for professional and consumer tools produced by Black & Decker, if not by others. *See id.* at 15. Moreover, catalogues from a number of manufacturers indicate that certain types of cutting tools are indeed specifically designed for professional or industrial use. *See, e.g.,* Brief of Defendant–Intervenor [ITC], Appendix 11.

Whatever the perceptions of producers or purchasers, all of the ITC members recognize a similarity of the channels of distribution of the tools. *Compare* Pub. 2658, p. 16 *with id.* at 60. With regard to production processes, the second group, Vice–Chairman Watson *et al.,* points to several similar steps in manufacturing professional and consumer versions. *See id.* at 61. The first group of commissioners refers to similarities in production as well but also states that the

> major components of professional and consumer tools are produced differently. Steel parts for professional tools are heat-treated ... to provide more strength and durability than their consumer counterparts. The motors for professional tools are manufactured with more sophisticated procedures and parts for extra durability. In general, parts and components for professional tools are manufactured using a greater number of production steps, higher quality raw materials, *i.e.,* alloy v. low carbon steel, and are designed to meet higher tolerances than parts and components for consumer tools.

*Id.* at 17 (footnotes omitted).

As for the final factor, price, Chairman Newquist *et al.* conclude that for professional tools may be several times the price of corresponding consumer/home-use tools at the re-

---

26. *Id.* at 36.

27. Pub. 2658, p. 13.

28. *See* ITC R.Doc 45, Exhibit 22, pp. 144–45. *But compare* Pub. 2658, p. 14 n. 32 ("In the final

investigation, Makita estimated that 'between 60 and 65 percent of its tools are currently purchased by do-it-yourselfers' based on Makita's warranty returns and marketing studies").

tail level[29], whereas the other group of commissioners characterizes the differences as "continua". *Id.* at 62.

As indicated above, the plaintiffs only contest the first group's like-product analysis as not based on substantial evidence. The court cannot concur, given the record developed and the judicial definition of such evidence, *supra.* Moreover, since "it is not the province of the court[] to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence"[30], suffice it to state in passing that there is also substantial evidence on the record in support of the like-product analysis of the other group of commissioners.

### B

The plaintiffs argue that, even if the two like-product definitions are accepted.

> the conclusion of Commissioners Newquist, Rohr and Nuzum that the industry had suffered material injury by reason of imports was unsupported by substantial record evidence. In addition, though Commissioners Watson, Brunsdale and Crawford correctly defined the "like product," and again assuming *arguendo* that the domestic industry was not healthy, their conclusion that any injury to such a domestic industry was due to the subject imports is without basis in the record. . . .
>
> The ITC staff failed to obtain pricing information adequate for purposes of making *either* injury determination, which is adequate grounds to require a remand by itself. In the first place, its data gathering was based on a definition of the "like product" that had no basis and ultimately was itself superseded. The ITC staff essentially determined *prior* to instituting its information-gathering effort that it would only seek that information which supported its assumptions and misperceptions regarding the industry.

Plaintiffs' Brief [ITC], pp. 70–71 (emphasis in original, citations omitted).

Subsection A of 19 U.S.C. § 1677(7) (1993) defined material injury as "harm which is not inconsequential, immaterial, or unimportant". In making determinations in regard to such injury, subsection B stated that the ITC (i) must consider

> (I) the volume of imports of the merchandise which is the subject of the investigation,
>
> (II) the effect of imports of that merchandise on prices in the United States for like products, and
>
> (III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

(ii) may consider

> such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports[,]

while subsection C provided as follows for evaluation of relevant factors for purposes of B, including:

### (i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

### (ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

> (I) there has been *significant* price underselling by the imported merchandise as compared with the price of like products of the United States, and
>
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

### (iii) Impact on affected domestic industry

---

29. Pub. 2658, p. 18.

30. *Chung Ling Co. v. United States*, 16 CIT 636, 648, 805 F.Supp. 45, 55 (1992).

In examining the impact required to be considered under subparagraph (B)(iii), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

The Commission shall evaluate all relevant factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

It has been held that these factors need not all be one way for an affirmative finding of material injury. *See, e.g., Iwatsu Electric Co. v. United States,* 15 CIT 44, 49, 758 F.Supp. 1506, 1510 (1991). *Cf. Saarstahl AG v. United States,* 18 CIT 595, 599–600, 858 F.Supp. 196, 200 (1994). Indeed, it has long been stated in the legislative history of the statute that the

significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor ... can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide.

S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979), U.S.Code Cong. & Admin.News 1979, p. 474.

(1)

The plaintiffs refer to "numerous positive factors demonstrating the health of the domestic electric cutting tool industry"[31], which, according to them, the ITC either "glossed over"[32] or failed to properly consider[33]. But the commissioners do not appear to have disregarded "certain positive factors, such as production, shipments and net sales", to quote from the views of the first group, Pub. 2658, p. 25. Rather, other, negative factors were found to be of greater moment. For example, operating income and PECTs net income both declined substantially over the period of investigation. *See, e.g., id.* at 27, 66. Capacity utilization rates were found to be low[34], and year-end inventories of PECTs were large. *See, e.g., id.* at 26. Moreover, while, as indicated, shipments of domestic PECTs increased, the rate thereof was less than that for U.S. consumption of such goods. *See, e.g., id.*

The plaintiffs also claim that other economic factors like a "tarnished image" of Black & Decker and a downturn in new home construction, rather than imports, adversely affected the health of the domestic industry. *See* Plaintiffs' Brief [ITC], pp. 64–67. The Commission, however, is required to consider an industry as a whole, not necessarily the plight of an individual constituent thereof. *See generally* 19 U.S.C. § 1677(4). And, while it may consider "other economic factors" per 19 U.S.C. § 1677(7)(B)(ii), *supra,* the primary obligation is examination of the factors set forth in subpart (i), as elucidated by subsection (C).

(2)

As for those considerations, the plaintiffs do not contest the finding that increases in "the volume of imports of the merchandise" were "significant" within the meaning of 19 U.S.C. § 1677(7)(B)(i)(I) and (C)(i).[35] Rath-

---

**31.** Plaintiffs' Brief [ITC], p. 69.

**32.** *Id.* at 61.

**33.** *Id.* at 69.

**34.** *See, e.g.,* Pub. 2658, pp. 26, 65.

**35.** Chairman Newquist *et al.* determined that

LTFV imports of PEC tools from Japan, and U.S. shipments of those imports, increased significantly, both in terms of quantity and value over the period of investigation.... The large volume of subject imports as well as the signifi-

er, they dwell upon the ITC staff's method of collecting and using the volume and also the pricing data, as well as the Commission's interpretation thereof. They argue that (a) the staff questionnaires and pricing data were inaccurate by not reflecting the ITA's final definition of imports of PECTs found sold at less than fair value; (b) the staff collected detailed pricing data on too small a percentage of tools; (c) it did not collect information on PECTs imported from non-subject countries; and (d) the staff failed to consider price/quality tiers in which the imports and domestic products competed.

■ In challenges to ITC investigative thoroughness, cases have been remanded only for failure to seek critical information. *See, e.g., Hannibal Industries, Inc. v. United States,* 13 CIT 202, 207, 710 F.Supp. 332, 336 (1989), citing *USX Corp. v. United States,* 11 CIT 82, 655 F.Supp. 487 (1987); *Budd Co. Ry. Div. v. United States,* 1 CIT 67, 507 F.Supp. 997 (1980). As long as the methodology and procedures are a "reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987).

(a)

The plaintiffs argue that the Commission never adjusted the data to reflect the ITA's ultimate PECTs definition and later failed to seek pricing data for all cutting tools, not just professional models. In conducting investigations, however, the "ITC is not required to amass every conceivable shred of relevant data in order to comply with the

requirements of the law". *USX Corp. v. United States,* 11 CIT at 95, 655 F.Supp. at 498. Upon review of the records developed, the court does not find that the ITA's definition substantially affected the Commission's data since the adjustment had impact on only a small percentage of the subject imports.[36] Furthermore, the defendants claim that,

> [i]mmediately after Commerce's final determination was issued ..., the Commission requested ... that all producers and importers of PEC and CEC tools provide revised data which would permit [it] to assess evidence that conformed with Commerce's final determination.

Defendant ITC Memorandum, p. 47.

(b)

■ The plaintiffs argue that the ITC staff compiled pricing data for too few tools, but the record reveals that the staff gathered data for a representative sample composed of three types of professional tools (circular, jig and reciprocating saws) and one kind of consumer tool, circular saws. Since several different models are in each category, the Commission requested that domestic and foreign producers give the model numbers for the comparable products in each. The staff compiled the pricing data received, including that provided by Makita.

The court does not conclude that this was inadequate, in particular in view of the products for which price data were requested, to wit:

*Product 1:* Reciprocating Saw: Approximately 4 to 6.5 amps, variable speed, 2,300 to 2,400 strokes per minute.

*Product 2:* Circular Saw: Approximately 13 amps, 5,200 to 5,800 rpm, 7.25 inch blade.

\* \* \* \* \* \*

cant and increasing share of domestic consumption accounted for by the U.S. shipments of LTFV imports of PEC tools from Japan are important factors in our affirmative determination.
*Id.* at 32 (footnote omitted). The second group of commissioners reached a similar conclusion. *See id.* at 68–69.
Although the plaintiffs do not dispute the finding(s) of increased volume, they claim that this is essentially the only factor tending to support the

material-injury determination. *See* Plaintiffs' Brief [ITC], pp. 79, 82.

36. Only one Makita model was directly affected. The plaintiffs counter that the ITC assumes that other purchasers did not report sales data which included this model. Plaintiffs' Reply Brief [ITC], p. 56. And if that data had been reported, "this would have overstated the volume of imports." *Id.*

*Product 5:* Jig Saw: Super duty 3.5 to 4.5 amps, orbital cut, speed 0–3,100 strokes per minute.

*Product 6:* Circular Saw: Approximately 10 amps, 2 to 2-1/8 horsepower motor, 7.25″ blade, 4,600 to 5,300 rpm.

Pub. 2658, p. I–37. There is little indication that the Commission sought to rely on unrepresentative models or that the pricing data received were not representative. *Cf. Wieland Werke v. United States,* 13 CIT 561, 574, 718 F.Supp. 50, 60 (1989).

(c)

The plaintiffs claim that the ITC "never sought data as to non-subject imports from other countries" and that the data obtained did not distinguish professional from other tools. Plaintiffs' Brief [ITC], p. 72. However, as long as their "imports contribute, even minimally, to the conditions of the domestic industry, ... the Commission is precluded from weighing the causes of injury" by others. *Citrosuco Paulista, S.A. v. United States,* 12 CIT at 1228, 704 F.Supp. at 1101, quoting *British Steel Corp. v. United States,* 8 CIT 86, 96, 593 F.Supp. 405, 413 (1984). Moreover, non-subject imports of electric cutting tools from other countries are referenced. *See* Pub. 2658, pp. I–31 to I–33. In short, plaintiffs' objection to the lack of non-subject-import information does not appear well-founded.

(d)

The plaintiffs claim that the models identified by the Commission are "fatally flawed" due to the failure to take into account the price/quality tiers in which they compete, "thereby unfairly highlight[ing] the lower prices of the imports, and mask[ing] the natural medium price levels at which the ... imports did compete with domestic producers". Complaint [ITC], para. 24(f). *See also id.,* para. 24(r); Plaintiffs' Reply Brief [ITC], pp. 59–60. That is, Makita argues that the electric-cutting-tool industry should be divided into premium, moderate and lower price/quality tiers, with its tools found at the moderate level. The plaintiffs refer to observations of Vice–Chairman Watson *et al.* that

"imports of PEC and PES tools from Japan tend to be positioned at the moderate or middle range of prices"[37] and that "Japanese imports have occupied a mid-level position on the price-quality spectrum of EC tools, competing in all market segments." Pub. 2658, p. 70.

The ITC can apply a segmented-market analysis "in reaction to varying levels of customer demand, rather than to adjust for physical differences in the products themselves." *Acciai Speciali Terni, S.p.A. v. United States,* 19 CIT ——, ——, 1995 WL 476719, at *11 (Aug. 7, 1995). But neither the statute nor its legislative history requires the Commission to adopt a particular analysis when the market has segments. *Id.* And the court notes in passing that an argument similar to plaintiffs' was raised in *Encon Industries, Inc. v. United States,* 16 CIT 840, 1992 WL 245899 (1992), in which the plaintiff had sought to distinguish between "low-end" and "high-end" ceiling fans on a market-segment basis. It argued that the products at each end were so different that imports which competed directly with low-end fans could not possibly affect high-end producers. The court did not accept the argument, referring to it as "a back-door way of saying that the 'like product' determination ... is wrong." *Id.* at 842.

(3)

The plaintiffs are of the view that injurious pricing is the

single most significant factor in an injury determination in antidumping cases. Commissioners Newquist, Rohr and Nuzum found mixed pricing (*i.e.,* overselling as well as underselling) in both their analysis of the "professional" electric cutting industry and the "professional" sanding/grinding industry.... By accepting mixed underselling by imports as non-injurious in the "professional" sanding/grinding tool industry, it is hard to see how they could view pricing in the "professional" electric cutting tool industry any differently. If, in fact, the experience of the "professional" sanding/grinding tool industry is

---

**37.** Pub. 2658, p. 62.

to serve as a benchmark, as this group of Commissioners suggested it should ..., then they should have rendered a negative injury determination with respect to imports of "professional" electric cutting tools.[38]

But the Commission "need not find a consistent pattern of underselling to make an affirmative determination", only that the "mixed trends are adequate to establish causation." *Holmes Products Corp. v. United States*, 16 CIT 1101, 1104 (1992), citing *Florex v. United States*, 13 CIT 28, 40, 705 F.Supp. 582, 593 (1989). Here, the data for sales of reciprocating saws to retailers reflect underselling only, as does that for jig saws every quarter but one. With regard to circular saws, a mixed pattern of underselling and overselling was found to exist. *See, e .g.*, Pub. 2658, pp. 34–35. Chairman Newquist *et al.* consider this "significant price undercutting by the imported merchandise" within the meaning of 19 U.S.C. § 1677(7)(C)(ii)(I), and this court cannot hold otherwise on the record presented.

The plaintiffs also claim that this group never verified evidence of lost domestic sales. While the record indicates that business is not conducted on an open-bid basis, several instances of lost sales and lost revenues are in fact presented. *See* Pub. 2658, pp. I–43 to I–45. The record shows that Makita granted discounts on cutting tools in the last quarter of 1992 which, in one instance, were "$15 to $20 less than Makita's usual price." *Id.* at I–44. In another cited example, the purchaser placed an order for a "one-year supply of merchandise" due to Makita's price reduction. *Id.*

Although lost-sales and lost-revenue evidence may be anecdotal, it is of some moment, in the context of corroboration. *See, e.g., Iwatsu Electric Co. v. United States*, 15

CIT at 53 and 758 F.Supp. at 1514 n. 15. Such evidence confirms what is indicated by decreasing demand, rising shipments of imports and underselling by them. *Lone Star Steel Co. v. United States*, 10 CIT 731, 733–34, 650 F.Supp. 183, 186 (1986).

 Despite plaintiffs' contentions regarding lost-sales data, the evidence thereof on the record, along with that of price suppression and underselling in conjunction with the increased volume of imports, support the affirmative determination of Chairman Newquist *et al.* Indeed, no specific type of lost sales is required[39], and "[w]here fungible goods are concerned, volume may be the best indicator of lost sales rather than the anecdotal evidence obtained in the typical lost sales study." *Gifford–Hill Cement Co. v. United States*, 9 CIT 357, 368, 615 F.Supp. 577, 586 (1985). *See, e.g., Granges Metallverken AB v. United States*, 13 CIT 471, 481, 716 F.Supp. 17, 26 (1989). Given the record developed and the fungibility of PECTs[40], the court concludes that the affirmative determination by those commissioners of material injury caused by the PECTs imports to the domestic industry is in accordance with law.

(4)

 The defendants state that the second group of commissioners

> could only make price comparisons between imports subject to investigation and the like product. Since the like product composed of all EC tools included lower priced articles as to which no subject import corresponds, these Commissioners who defined the like product as all EC tools could not conduct price comparisons on those articles.

---

38. Plaintiffs' Brief [ITC], pp. 78–79 (citations omitted). The commissioners named compared both kinds of tools since they share similar market conditions, price sensitivities and showed similar increases in net sales, shipments and production. *See* Pub. 2658, p. 36. While the pricing data for both kinds revealed some mixed trends, only the effects on PECTs were found to be significant by this group of commissioners.

39. *See, e.g., Czestochowa v. United States*, 19 CIT ——, ——, 890 F.Supp. 1053, 1076 (1995) ("the ITC is not statutorily required to use a particular methodology to review lost sales... or ... lost revenue" but has the "discretion to pursue investigations which ... yield substantial evidence to support its determinations").

40. *See, e.g.*, Pub. 2658, p. 33 ("the subject imports are very good substitutes for the domestically produced PEC tools").

Defendant ITC Memorandum, p. 84. Hence, this group based its affirmative determination on such factors as the "substitutability between subject imports and the domestic like product, the availability of substitute products in the market, and the dumping margin". Pub. 2658, pp. 69–70. But it also considered price suppression unlikely as a result of this substitutability.[41] However, the ITC "must assess causation", notwithstanding difficulty or even impossibility of direct price comparison. *E.g., Iwatsu Electric Co. v. United States*, 15 CIT at 54, 758 F.Supp. at 1515. Moreover, the record is not clear enough that the non-pricing factors are so significant as to enable these commissioners to forgo any meaningful consideration of underselling and lost sales. *See, e.g., R–M Industries, Inc. v. United States*, 18 CIT 219, 227–28, 848 F.Supp. 204, 211 (1994). Indeed, "[s]ales lost due to underpricing is an important test of injury in the case of fungible goods." *Gifford–Hill Cement Co. v. United States*, 9 CIT at 368, 615 F.Supp. at 586. Absent such consideration on the record, the court cannot and therefore does not sustain their determination.

(5)

Be that as it may the plaintiffs are not entitled to relief since the affirmative determination of Chairman Newquist and Commissioners Rohr and Nuzum is supported by substantial evidence on the record and otherwise in accordance with law, which, among other things as shown above, provides for such a determination when at least half of the commissioners vote therefor.

IV

To the extent other matters raised in plaintiffs' thorough papers have not been specifically addressed, the court has concluded that they do not warrant any discussion like the foregoing, which requires that plaintiffs' motions for judgments on the agency records be denied and these actions dismissed.

So ordered.

Court Nos. 93-08-0450 and 93-08-00451

*JUDGMENT*

This action having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that plaintiffs' motion for judgment on the agency record be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that this action be, and it hereby is, dismissed.

---

41. *See* Pub. 2658, p. 71. Including pricing data for a domestic circular saw at the low range of the "continuum", Vice Chairman Watson did note periods of underselling. *See id.* at 71–72, n. 98. The other two commissioners commented that "evidence of underselling is not very probative in cases, like this one, where one cannot simply assume that non-price factors distinguishing the dumped from the domestic product are trivial." *Id.* at 72, n. 99.